23 May 2000

No. 2--98--1081 

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF      ) Appeal from the Circuit Court

ILLINOIS,                       ) of Winnebago County.

                                )

Plaintiff-Appellee,        )

                                )

v.                           ) No. 97--CF--1081

                                )

MARVIN WILLIAMS,                ) Honorable

                                ) K. Craig Peterson,

Defendant-Appellant.       ) Judge, Presiding.

_________________________________________________________________

JUSTICE THOMAS 
delivered the opinion of the court:

The defendant, Marvin Williams, was charged by indictment with four counts of first-degree murder (720 ILCS 5/9--1(a)(3) (West 1998) in connection with the shooting deaths of Justin Levingston and Adrienne Austin.  The indictment alleged that the defendant shot the two victims on March 18, 1997, during the commission of a home invasion (counts I and II) or, in the alternative, during the commission of an attempted armed robbery (counts III and IV).  Following a jury trial, the defendant was convicted of two counts of first-degree murder.  The trial court sentenced him to a term of natural life imprisonment, without parole.  The defendant appeals, contending that (1) an eyewitness voice identification of the defendant, stemming from an observation at a pretrial hearing, should not have been admitted at trial, (2) the State improperly elicited testimony from a codefendant for whom the State had agreed to provide protection in prison in exchange for his testimony, and (3) certain comments by the prosecutor during closing argument were improper and denied defendant a fair trial.

Prior to trial, the defendant filed a motion seeking to exclude voice identification testimony from Lovenia Hinton.  At a hearing on that motion held outside the presence of the jury, Hinton testified that she went to the Winnebago County courthouse on June 13, 1997, because she had been informed by her brother that the defendant had a court appearance scheduled and she wanted to see the defendant.  She had heard that the defendant was the one who had shot her nephew and sister-in-law.  Prior to coming to court on June 13, Hinton had not had any contact with the State's Attorney's office.  Hinton entered the courtroom on June 13 and sat in the back row next to her brother and mother.  The defendant's case was called, and Hinton knew that the defendant would be coming into the courtroom.  Hinton was bent over, had her head down, and was looking at the floor when she heard a voice say, "Why do I have to be shackled like this[?]"  At that point, Hinton raised her head, looked at her mother, and told her that that was the voice  she had heard on the night her house was broken into when her nephew and sister-in-law were shot.  She explained that, on the night of the murders, she was underneath the kitchen table with her head down when she heard a voice from 9 or 10 feet away say, "Who else is in the house, who else is in the house[?]"  At the hearing on the motion to suppress the identification, Hinton identified the defendant in court as the person whose voice she had heard in the courtroom on June 13.  She further testified that after she recognized the defendant's voice her brother spoke to an assistant State's Attorney and she eventually gave the police a statement indicating that the voice she had heard in the courtroom was the same voice she had heard on the night of the murders asking if anyone else was in the house.

The trial court denied the defendant's motion to exclude the voice identification.  Thereafter, Hinton testified before the jury that on March 17, 1997, she lived with Justin Levingston,  Adrienne Austin, and four-year-old Luckia Austin, at 1438 North Church, in Rockford, Illinois.  That night, she fell asleep on the living room couch watching television.  Around 2 a.m., she heard noises coming from the porch outside.  She then heard voices outside and the door being kicked in.  She heard a total of two kicks on the door.  She then heard voices saying, "This is the police."  A gunman then pointed a long-barreled gun at her face and grabbed her by her head.  The man told her not to look and asked her where "their shit" was located.  She then looked to the right and saw two men hitting Adrienne.  The man who was holding a gun to her then took her into the kitchen and indicated that she should look at the wall.  He again asked about the "shit" and then asked where "the Mexican ***" was."  Hinton thought he was referring to Justin, who was light-skinned, so she pointed upstairs.  He then told Hinton that the only reason they were there was that "he stole their reefer."  The man then put Hinton down on the floor, with her face to the floor.  She was on her knees, underneath the table.  He told her not to move, look, or say anything.  Shortly after that, she heard a gun shot, then another gunshot, and then she heard Adrienne say, "Oh, my God."  At that time, the man who had brought Hinton into the kitchen was rubbing her back and telling her that it was going to be all right.  She then heard another gunshot.  Luckia then ran toward the kitchen, and the man told Hinton to grab the child, hold her, and keep her quiet.  Hinton complied with that order.  She then heard footsteps coming down the steps.  From about 9 or 10 feet away she then heard a voice saying, "Who else is in the house, who else is in the house[?]"  After that, it was quiet for a moment and then she heard the same voice say, "We up, this GD, we up."  Thereafter, she heard footsteps going out the door and a car speeding off.

Hinton further testified that after the car drove off she grabbed Luckia and hid in the basement for a while.  She then went upstairs and found Levingston lying on the stair landing, dead.  She found Adrienne in a bedroom crouched down on the floor.  Adrienne was struggling to breathe, with blood running from her shoulder.  Hinton eventually called 911, and a tape recording of her call was played for the jury.

Hinton stated that she told the 911 operator on the night in question that five black men had come into her house.  However, she told the police when they arrived on the scene that she saw two suspects making a lot of noise but there may have been more.  Hinton acknowledged that at codefendant Emmitt Wright's trial she had testified that there were three or four men.  However, she stated that she now believed that there were at least four men involved.  She heard two of them go upstairs, and one remained with her in the kitchen.  She stated that she believed all the men were black because of their voices, and she knew that the man who held her in the kitchen was black because she saw him.  She explained, however, that she could not see his face.

Hinton also testified that she went to the courthouse on June 13, 1997, because she wanted to see what Marvin Williams looked like and she had heard that he had done the shooting at her house.  The defendant walked out in handcuffs and shackles when his case was called.  When the subject of the blood discovered on the defendant's shoes was being discussed, Hinton put her head down.  While her head was down, she heard the defendant ask the judge why he had to be shackled.  He said it loud enough for her to hear it in the back of the courtroom.  After she heard the defendant's voice, she turned to her mother and told her that it was the same voice that she had heard on the night of the murders that had said,  "Who else is in the house, who else is in the house, this GD, we up."

Lemual Conley testified that he had known the defendant for more than two years and that he knew him quite well from "hanging out" with him.  On the night of March 17, 1997, Conley and the defendant hung out together at the Fairgrounds housing project and then went to the Salvation Army to play basketball.  Conley and the defendant eventually left there with Emmitt Wright and Antonio Trammell in Wright's car and went to buy liquor.  After stopping at the liquor store, they went to a house where they drank, talked, and played video games.  Someone mentioned a person who had 30 pounds of marijuana at his house, and they all agreed that they should just go there and take it.  Wright drove the four of them to a house on Church Street.  They parked across the street and walked to a house on the corner.  Conley carried a .22-caliber handgun, and the defendant carried a .38-caliber handgun.  Trammell and Wright were unarmed.

Conley further testified that the four of them went up to the door of the house and Wright knocked on the door and then kicked it twice.  It opened on the second kick.  They then entered the living room of the house and Conley yelled, "police."  He saw two women, one on each couch.  He grabbed one of the women by the arm and asked her where the "shit" was.  She pointed upstairs.  Conley then took her into the kitchen and told her to look at the wall and not at him.  The defendant and Wright had taken the other woman upstairs.  Conley could hear commotion coming from upstairs, and after two or three minutes he heard a shot.  Shortly after that, he heard another shot.  Then he heard more commotion from upstairs.  A little girl then came into the kitchen area and Conley pushed her toward the woman in the kitchen, who was now kneeling down.  Conley rubbed the woman's back, telling her to be cool and everything would "be straight."  He did this to keep her from panicking.  Then, Conley heard two more shots and more commotion from upstairs.  At that point, Conley went toward the living room and saw Trammel there.  Conley then proceeded to go up the steps.  He stepped past Levingston, who was lying on the stairwell.  Conley went into one of the upstairs bedrooms and saw the defendant standing in the room, alone.  Conley then went back downstairs and into the kitchen and again told the woman to be cool.  Conley then heard two more gunshots, about 10 seconds apart.  The defendant then came down the stairs and into the kitchen near where Conley was standing.  The defendant pointed his gun at the woman who was kneeling down in the kitchen and said, "Fitting to get her."  At that moment, Conley pushed the defendant's arm out of the way, stood between the defendant and the woman, and told the defendant that that was not the reason they came.  They then exited the house through the front door and left in Wright's car.  As they were leaving the house, Conley yelled, "G.D., we up."  Wright eventually dropped Conley and the defendant off at the Fairgrounds housing project, at 957 Acorn, which was the home of Angela Williams, the defendant's sister.  Conley threw his gun into a box in a closet at Angela's house.  That night he stayed at 963 Acorn, a few houses down.  Conley stated that he had a "relationship" with Angela at the time.

Conley admitted that when he was first questioned by the police following the incident he denied involvement and claimed that he spent the night at Angela William's house.  Conley acknowledged that he wrote a letter to Steven Hambrick while in jail on March 23, 1998, stating, "I wouldn't feel so bad if there was another way to get less time than to lie about *** what and who was there; but man, these punks was talking crazy anyway.  I thought you was out there getting them tight flow lyrics together like that one cut, 'Smoke it till it's gone.' "

Conley also testified that he had an agreement with the State that, in exchange for his truthful testimony in this case, he would be allowed to plead guilty to home invasion, armed violence, and attempted armed robbery.  The sentencing range would be from 15 to 45 years in prison, and the sentence to be imposed within that range would be left to the trial court's discretion.  The State also agreed to dismiss an unrelated armed robbery charge and to provide whatever protection it could, if necessary, while the defendant was incarcerated in the Department of Corrections.  Conley acknowledged that he had been convicted of felony theft in 1996. 

Sixteen-year-old Antonio Trammell testified that after playing basketball at the Salvation Army on March 17, 1997, the defendant said that he knew a "guy who got somebody for 40 pounds of marijuana," and the defendant asked if Trammell, Conley, and Wright wanted to go there.  The four of them drank beer and cognac, and the defendant again talked about getting the marijuana.  During the ride to the house on Church Street, they all agreed to go into the house and take marijuana and money.  After parking, Trammell put on a ski mask.  Upon reaching the house, Wright kicked the door in and they ran inside.  Conley hollered, "Police, get down," and then ran over to a woman and hit her in the face with his gun.  Trammell heard another woman scream about her baby.  Conley directed a woman into the kitchen.  The defendant and Wright then went upstairs, while Trammell stayed in the hallway.  Trammell then heard the defendant's voice, which was coming from upstairs, ask someone where "the shit" was.  Trammell then heard a shot and a man in pain.  The defendant again asked where "the shit" was, and then there was another shot.  A woman said, "Oh, no, my son," and the defendant asked, "Bitch, where's the shit at[?]"  The woman answered that she did not know, and the defendant accused her of playing with him.  Trammell then heard another shot.

Trammell further testified that after he heard the three shots mentioned above he heard something tumble down the stairs.  Trammell then saw Levingston on the stairwell, with blood around his chest and face.  Trammell then heard the defendant say, "Oh, you faking," and then Trammell heard another gunshot.  At that point, Trammell went into the kitchen and saw Conley emptying a can onto a table.  Trammell asked Conley where the other woman was, and Conley told him that she was underneath the table.  Trammell then went to the front door of the house and saw Wright pulling a car up to the front of the house.  Trammell then ran and got into the car.  All four of them eventually got into the car and they drove away.  They dropped off the defendant and Conley at the Fairgrounds housing project.

When he was arrested on March 27, 1997, Trammell denied any knowledge of the incident.  Later, he told the police that he was there but did not do any shooting.  Trammell admitted that he wrote his mother a letter telling her that his attorney had told him that they would have to make it seem as though he did not know that there was going to be a robbery or that he ran out before any shots were fired.  Trammell explained, however, that he was merely trying to inform his mother about what his attorney had told him about accountability.  Trammel acknowledged that his record contained an adjudication of delinquency in 1995 for a drug offense.

Rockford police officer Mike Triplett testified that sometime after 2:30 p.m. on March 20, 1997, he was in the 700 block of Lee Street in Rockford, Illinois, looking for the defendant and Conley.  Officer Triplett saw Conley on Lee Street and placed him under arrest.  Shortly thereafter, Triplett was standing in the 700 block of Lee Street when he looked over and saw the defendant standing in a doorway at 963 Acorn.  Officer Triplett advised Officer Louis Hill, who went into the residence there.  The defendant was not inside, but the back door had been left open.  Officer Triplett eventually went to 957 Acorn, where Angela Williams lived.  Officer Triplett told Angela that he was looking for the defendant.  She allowed him inside, along with Officer Hill and another officer.  Once inside, they found the defendant in a bedroom.  The defendant was lying facedown on a mattress, with his head pointed toward the wall.  He was wearing jeans, a shirt, tennis shoes, and he was breathing heavily.  Officer Hill placed the defendant under arrest and took him to the police station.  At the police station, the defendant was wearing the same shoes he had on at the time of his arrest.

Other evidence presented at trial revealed that the police seized a loaded .22-caliber revolver from a box located on the table in Angela Williams's kitchen.  The bullets that killed Austin and Levingston were fired from either a .38- or .357-caliber weapon.  The shots fired at the house that night could not have come from the .22-caliber handgun found at Angela's house.  The DNA evidence indicated that human bloodstains were found on the shoes worn by the defendant at the time of his arrest.  Those stains were consistent with the blood profile of Levingston.  For one of the bloodstains found on the defendant's shoe, the expected frequency was 1 in 940,000 blacks, 1 in 54,000,000 Caucasians, and 1 in 6,800,000 Hispanics.  The evidence also indicated that a stain found on Conley's shoe matched Levingston's blood profile.

Twenty-six-year-old Martinez Mineau testified that he was a friend of the defendant and had known him for six or seven years.  Mineau claimed that he had known Trammel since 1996.  Mineau stated that Mineau was at his father's house on the morning of March 18, 1997, when Trammell came over.  According to Mineau, Trammell told him at that time that Trammell had gone on a robbery and "some *** got popped off."  Trammell told him that Conley and a man named "Red" were responsible.  Mineau also claimed that Trammell told him that they had been at the house of someone named "E."  They then went to "a Mexican guy's" house and kicked the door in, and Trammell told Conley to "get them on the couch."  Trammell and Red then ran upstairs.  Trammell beat "the Mexican" and asked for the "shit."  When "the Mexican" refused to cooperate and played stupid, Trammell shot him, and the man fell downstairs.  Meanwhile, Red was yelling at a woman in the other room.  Mineau further claimed that Trammell told him that he was drunk and that Trammell "snapped" and shot the woman.  They then ran downstairs and Red said, "We up," and they all left the house.  According to Mineau, Trammell never mentioned the defendant or Emmitt Wright.  Trammell said that he drove "E's" car that night and asked Mineau what to do.  Mineau told him to give the car back.

Mineau testified on cross-examination that he met Emmitt Wright for the first time on March 18, 1998.  At the time, Mineau and Wright were incarcerated in the same tier of the county jail.  Two days after meeting Wright, Mineau reduced to writing for the first time the pertinent facts that Mineau claimed Trammell told him one year earlier on March 18, 1997, about the home invasion and shootings in question.  Mineau denied that he had collaborated with Wright to put together the statement.  Mineau admitted that he had two prior convictions of aggravated battery and one prior conviction of unlawful use of a weapon by a felon.

Antonio Trammell was recalled as a defense witness.  Trammell testified that he was not a close friend of Mineau and he would not have confided any secrets to him.  Furthermore, Trammell never had any conversations with Mineau about this case.  Trammell noted that Mineau was a friend of the defendant.

Marketa Gulley, the defendant's aunt, testified that she had a confrontation with Conley late in February or early in March of 1997.  The defendant stepped in and words were exchanged between the defendant and Conley.  Gulley denied that she had been convicted of deceptive practices in 1988.  However, the parties stipulated before the jury that Gulley was in fact convicted of deceptive practices in 1988.  Conley was recalled as a witness and denied that he had gotten into an altercation with either the defendant or his aunt.

The defendant testified that he spent the afternoon and evening of March 17, 1997, at his sister Angela's house at 957 Acorn.  Conley, Deron Hill, Angela, and Angela's children were also there.  Around 10 p.m. he left Angela's and went to the apartment of Tamara Miller, which was about 5 or 10 minutes away.  According to the defendant, Miller was home with her two-year-old son.  The defendant said that he stayed all night at Miller's apartment.  He woke up at 11:30 a.m. and ate breakfast.  Later that day, he returned to Angela's house around 1:30 p.m., where he saw Conley, Hill, Angela, a couple of Angela's girlfriends, and some children.  Nothing was said about the shooting at that time.

The defendant further testified that Conley was dating Angela, but she was also seeing a man named "Red."  According to the defendant, Conley did not know that Red was seeing Angela.  The defendant did not know Red's real name, where he worked, or with whom he associated.  The defendant stated that the defendant stayed at Angela's house three or four nights per week and that he kept most of his clothes there.  He had 18 or 19 pairs of tennis shoes, mostly Filas or Nikes.  According to the defendant, he ran into Red on March 18.  Red asked him if he could borrow a pair of his tennis shoes.  The defendant indicated that he could but told Red to bring them back.  The defendant claimed that at the time of the crime Red was wearing the shoes that the police eventually seized from the defendant at the time of the defendant's arrest.  The defendant said that he was not wearing any shoes at the time of his arrest.  He asked the officer if he could put on some shoes.  The defendant put on the pair of shoes that Red had been wearing.  The defendant claimed that he wore size 14, while the shoes he put on after he was arrested by the police were size 13.

The defendant also testified that following his arrest he told the police that he and Conley were at Angela's house because he thought that they were asking him about an unrelated armed robbery.  However, the defendant later testified that he told the police that he and Conley had been at Angela's house on the night of the murders and that the defendant had stayed there all night.  The defendant said that in March he and Conley got into a physical fight in connection with the defendant's aunt.  Conley cut the defendant's lip and said to the defendant, "I'm gonna fuck you up."  The defendant admitted that he was housed in the same jail cell for a day and half with Martinez Mineau in July 1997.  The defendant said he did not talk to Mineau about his testimony in this case or about his testimony in codefendant Wright's case.  The defendant denied that he and Mineau concocted Mineau's story while they shared a jail cell together for a day and a half.

Rockford police officer Bruce Scott testified that on March 20, 1997, he gave the defendant his 
Miranda
 warnings and the defendant waived his rights by signing a waiver form.  Scott then told the defendant that he wanted to talk about the murders on Church Street.  The defendant told Scott that he spent the night at Angela Williams's house and that he went to bed around midnight.  Scott said that he tried to show the defendant a statement from Angela, but the defendant did not want to look at it.  The defendant then told the officer that he had been at Tamara Miller's on the night in question, arriving at midnight and spending the night there.  Officer Scott then drove to Miller's house, but no one answered the door.  Upon his return, Scott told the defendant that Miller had denied that the defendant was with her.  The defendant then changed his story and told Officer Scott that he had been with Angela that night.

On appeal, the defendant first argues that the trial court erred in allowing the State to introduce the voice identification testimony of Hinton.  The defendant characterizes the circumstances under which the identification was made as a "lineup" and contends the identification was impermissibly suggestive and violated his right to due process.  The defendant also claims that his right to the effective assistance of counsel at a postindictment lineup was violated given that his counsel was unaware of Hinton's presence in the courtroom at the time she recognized the defendant's voice.

Generally, a trial court's ruling on a motion to suppress identification evidence is subject to reversal only if it is manifestly erroneous.  
People v. Wardlow
, 183 Ill. 2d 306, 309 (1998); 
People v. Moore
, 266 Ill. App. 3d 791, 796 (1994).  Identification by voice is permissible and may establish a defendant's guilt beyond a reasonable doubt.  
People v. Nunn
, 101 Ill. App. 3d 983, 989 (1981).  The weight to be given voice identification evidence, like most factual determinations, is a question for the jury to resolve.  
Moore
, 266 Ill. App. 3d at 796.

Only where a pretrial encounter resulting in an identification is "unnecessarily suggestive" or "impermissibly suggestive" so as to produce "a very substantial likelihood of irreparable misidentification" is evidence of that and any subsequent identification excluded by law under the due process clause of the fourteenth amendment.  
Moore
, 266 Ill. App. 3d at 796-97, citing 
Neil v. Biggers
, 409 U.S. 188, 196-97, 34 L. Ed. 2d 401, 409-10, 93 S. Ct. 375, 380-81 (1972).  The due process analysis has two steps.  First, the defendant must prove that the confrontation was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law.  
Moore
, 266 Ill. App. 3d at 797.  If the defendant meets his burden, the State then has the burden of establishing that, under the totality of the circumstances, the identification made under suggestive circumstances is nonetheless reliable.  
Moore
, 266 Ill. App. 3d at 797.  The factors to be considered in determining reliability include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.  
Manson v. Brathwaite
, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253 (1977). Illinois courts hold that an identification based upon an "accidental encounter," where unprompted and positive, is not an impermissible showup and does not taint the in-

court identification by the witness where the police arranged neither the chance encounter nor the suggestive circumstances.  
Moore
, 266 Ill. App. 3d at 797; 
People v. Lutz
, 103 Ill. App. 3d 976, 982 (1982).  

Here, Hinton went to the courtroom on June 13, 1997, for the purpose of viewing the defendant.  Nothing in the record indicates that she went with the intention of comparing the defendant's voice with the voice she remembered hearing on the night of the murders.  It appears to be quite a fortuity that from her seat in the back of the courtroom with her head down she was able to recognize the defendant's voice as he complained to the judge.  Moreover, neither the police nor the State's Attorney's office arranged the chance encounter or suggestive circumstances.  Hinton testified that she had no contact with the State's Attorney's office until after she identified the defendant's voice on June 13.  Under the circumstances, we find that Hinton's voice identification was based on an unprompted, accidental pretrial encounter and, therefore, it is not deemed to be the result of an impermissible lineup or showup.

Additionally, we find that the identification testimony in this case satisfied the due process factors for assessing reliability applied in cases involving suggestive showups.  In the present case, the witness had an ample opportunity to hear the perpetrator's voice at the time of the crime, and she even recalled some of the exact words he used during the commission of the crime.  The witness was paying a great deal of attention to the words spoken by the perpetrator because she knew that her life hung in the balance based on his words.  Finally, the witness was certain that the defendant's voice was the same voice that she had heard on the night of the murders.  The fact that there was a three-month lapse between the crime and the identification did not outweigh the other factors supporting the conclusion that there was no substantial likelihood of misidentification.  

In 
Neil
, the Supreme Court found that a showup was not impermissibly suggestive even though a seven-month lapse occurred between the crime and the confrontation.  
Neil
, 409 U.S. at 196-

201, 34 L. Ed. 2d at 409-12, 93 S. Ct. at 380-83.  In that case, the police walked the defendant past the victim and directed him to say " 'shut up or I'll kill you.' "  
Neil
, 409 U.S. at 195, 34 L. Ed. 2d at 409, 93 S. Ct. at 380.  The Court weighed all of the due process reliability factors and determined that there was not a substantial likelihood of misidentification.  
Neil
, 409 U.S. at 196-201, 34 L. Ed. 2d at 409-12, 93 S. Ct. at 380-83.  Similarly, after weighing all the factors in the present case, we find that  there was not a substantial likelihood of misidentification, which would render the voice identification inadmissible on due process grounds.  Therefore, the actual weight to be afforded the testimony was a matter for the jury to resolve.

The defendant also argues that he was denied his right to the effective assistance of counsel at a postindictment lineup.  See 
e.g.
, 
United States v. Wade
, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967)(where Court held that defendants have a right to counsel at pretrial lineups and showups).  Because we have concluded that Hinton's voice identification of the defendant was based on an accidental encounter and not a lineup or a showup, we find that the case law relied upon by the defendant in support of his position is not on point.  The witness in the present case simply chose to attend a public hearing at which the defendant was adequately represented by counsel.  The prosecution was not aware of the witness's choice to attend the hearing, and the defendant cites no authority for his claim that the State should be burdened with a duty to inform the defendant of the presence of a potential witness in the courtroom.  Under these circumstances, we find that the defendant's argument must be rejected.

The defendant next argues that reversible error occurred when  the prosecutor elicited testimony from Conley that the State had agreed to provide protection for Conley while in prison, if necessary.  The defendant notes that it is improper for a prosecutor to ask questions that imply that a defendant made threats against a witness without any basis in fact to support such an implication.  See 
People v. London
, 256 Ill. App. 3d 661, 666 (1993).

Initially, we note that the defendant failed to object to the complained-of question and testimony at trial.  Accordingly, he has waived the issue on review.  See 
People v. Enoch
, 122 Ill. 2d 176  (1988).  The defendant urges that we review the issue under the plain error exception to the waiver rule.  134 Ill. 2d R. 615(a).  The exception allows for review of errors not raised in the trial court if the evidence was closely balanced or if the error was so serious that it denied the defendant a fair trial.  
People v. Garcia
, 231 Ill. App. 3d 460, 462 (1992).  Here, we do not find the evidence in the instant case to be closely balanced.  Conley and Trammell testified as to the defendant's presence and conduct during the commission of the crime.  Their testimony was substantially corroborated by Hinton's version of what happened that night and by the blood found on the defendant's shoes, which matched the blood of one of the victims.  Additionally, Hinton identified the defendant's voice as the voice of the man she had heard coming downstairs and asking who else was in the house.  At any rate, we find that no error occurred with respect to the question asked and the answer elicited by the prosecutor.

A prosecutor is allowed to set forth the terms of a plea agreement because it aids the jury in its task of evaluating the credibility of a witness.  See 
People v. Garcia
, 231 Ill. App. 3d 460, 473 (1992).  Here, the prosecutor established that Conley had pleaded guilty to various charges in connection with the events of March 18, 1997, in exchange for a dismissal of an unrelated robbery charge.  The prosecutor next asked if the State had also agreed to provide whatever protection was necessary for Conley while in the Department of Corrections.  The defendant claims that the only interpretation of that testimony is that the State had agreed to provide the witness with protection from the defendant.  However, we believe that the question can be interpreted fairly only as indicating that protection might be necessary because prison is a dangerous place in general and not that the defendant had threatened Conley.  This  is borne out by the prosecutor's closing argument, in which he told the jury that Conley was going to go to prison for long time with "a big old brand on his head that says snitch."  Moreover, defense counsel's failure to object to the question can be readily explained by the fact that the State's agreement to protect Conley in prison was something that defense counsel may have wanted the jury to hear since it could be viewed as an additional incentive for the witness to testify against the defendant.

The cases cited by the defendant in support of his argument are distinguishable.  Those cases involved prosecutorial comments or questioning that implied that a defendant made threats against a witness, when the record revealed that such implication was groundless.  See 
People v. London
, 256 Ill. App. 3d 661, 666 (1993); 
People v. Hood
, 229 Ill. App. 3d 202, 218 (1992).  Here, the prosecutor's questioning did not imply that the defendant had made threats against Conley.  Instead, the questioning merely disclosed the additional terms of the plea agreement between the witness and the State.  Accordingly, we find that no error occurred in the prosecutor's questioning in that regard.

Lastly, the defendant argues that the prosecutor's comments during closing argument amounted to reversible error.  Specifically, the defendant contends that the prosecutor engaged in name calling, placed the integrity of his office behind the credibility of the State's witnesses, and made comments regarding missing witnesses.

Initially, we note that in the defendant's posttrial motions the only issue raised as to prosecutorial misconduct during closing argument concerned the prosecutor's reference to the defendant as the "king of criminals."  By failing to raise the other matters in a posttrial motion, the defendant waived the issues.  
Enoch
, 122 Ill. 2d at 186.  Moreover, we are not inclined to consider the waived issues in this case under the plain error doctrine since the evidence is not closely balanced and the remarks were not so prejudicial as to deny the defendant a fair trial.  
People v. Bennett
, 304 Ill. App. 3d 69, 71 (1999).  However, even absent waiver, we find that the prosecutor's comments in this case were either not improper or did not rise to the level of reversible error.

A prosecutor is allowed a great deal of latitude in making closing remarks.  
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993).  A prosecutor's improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused (
People v. Coleman
, 158 Ill. 2d 319, 348-49 (1994)), such that absent the remarks the verdict would have been different (
People v. Cisewski
, 118 Ill. 2d 163, 175 (1987)).  Concerning the parameters of proper argument, the prosecutor may denounce the accused, reflect upon the credibility of the witnesses, and urge the fearless administration of justice if based on the facts in the record and the inferences fairly drawn therefrom.  
Bennett
, 304 Ill. App. 3d at 72.  The entire record, particularly the full argument of both sides, must be considered on a case-by-case basis to assess the propriety of prosecutorial comment.  
Bennett
, 304 Ill. App. 3d at 72.  Where the complained-of remarks are within a prosecutor's rebuttal argument, they will not be held improper if they appear to have been provoked or invited by defense counsel's argument.  
People v. Smith
, 199 Ill. App. 3d 839, 854 (1990).  Where a timely objection is made to an improper argument, the trial court can usually correct the error by sustaining the objection or instructing the jury to disregard the remark.  
People v. Hrobowski
, 216 Ill. App. 3d 711, 727 (1991).

With respect to the only issue properly preserved for review in this case, we note that the complained-of comment was made during the prosecutor's rebuttal argument in response to the defendant's argument that Trammell and Conley were testifying merely to get themselves a deal in exchange for portraying the defendant as the murderer.  The prosecutor's comments were also based on the evidence and upon the defendant's nickname of "Big Dog."  The prosecutor responded in rebuttal as follows:

"But make no mistake about it, ladies and gentlemen.  As we said they are robbers; they are thieves.  But make no mistake about it.  Antonio Trammell is Little Tony.  Lemual is Boobie.  Emmitt Wright is E.  But this defendant, this defendant is not just dog.  He is top dog.  He is Big Dog, king of the criminals that he hangs out with who don't work at the Fairgrounds Housing projects."

At that point, defense counsel objected "to king of criminals."  The trial court sustained the objection and admonished the jury to disregard the remark.  The prosecutor continued his argument, stating:

"He calls the shots.  He makes the big move.  He takes his lesser friends from simple armed robbery and home invasion to murder."

Considering the context of the complained-of remark, we find that the comment was invited by the defendant's argument and was based on the evidence presented in the case.  We further find that if any error did occur with respect to the remark it did not rise to the level of reversible error given the limited nature of the comment and the fact that the trial court sustained the objection and advised the jury to disregard the comment.

We have carefully examined the remaining claims of prosecutorial misconduct in the context of the entire record, and we conclude that the remarks made by the prosecutor were either not improper or, even if improper, not substantially prejudicial to the defendant.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

BOWMAN, P.J., and GEIGER, J., concur.