NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250564-U

NO. 4-25-0564

IN THE APPELLATE COURT

FILED
April 10, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| MARVIN WILLIAMS, | ) | No. 97CF1081 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott R. Paccagnini, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Grischow and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the trial court's order denying defendant leave to file a successive postconviction petition because defendant did not demonstrate a colorable claim of actual innocence.

¶ 2   In August 1998, defendant, Marvin Williams, was sentenced to a term of natural life imprisonment after a jury found him guilty of four counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 1996)). In February 2025, defendant filed a motion for leave to file a successive postconviction petition pursuant to section 122-1(f) of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2024)), alleging actual innocence based on the affidavits of Erick Conway and Tyrone Cooper. In May 2025, the trial court denied defendant's motion, finding the evidence cumulative to that presented at trial.

¶ 3   Defendant appeals, arguing the trial court erred in denying him leave because the petition presented evidence that was newly discovered, material and noncumulative, and would

probably change the result on retrial. Defendant asks this court to remand the cause to the trial court for second-stage postconviction proceedings, including the appointment of counsel. We disagree and affirm.

¶ 4                                         I. BACKGROUND

¶ 5          In May 1997, a grand jury indicted defendant on four counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 1996)). In May 1998, the trial court conducted a jury trial, at which the following evidence was presented.

¶ 6          On March 17, 1997, two people were killed in Rockford, Illinois, during a home invasion. Lovenia Hinton testified that, at that time, she resided with the victims, Justin Levingston and Adrienne Austin. At around 2 a.m., she heard voices outside and the door of the home being kicked in. A man pointed a gun at her, and she saw two men hitting Austin. The gunman grabbed her, took her to the kitchen, and told her to look at the wall. She then heard two gunshots, Austin speaking, and then another gunshot. She then heard a voice say, " 'Who else is in the house, who else is in the house?' " and " 'We up, this GD, we up,' " and heard footsteps out the door. After determining it was safe to go upstairs, she found Levingston dead on the stair landing and Austin in a bedroom, struggling to breathe and bleeding. She called 911, stating that five Black men had come into her house and she saw two suspects making a lot of noise, but that there may have been more. She also testified that she saw defendant at the courthouse on June 13, 1997, heard him ask why he had to be shackled, and identified his as the same voice that had said " 'Who else is in the house, who else is in the house, this GD, we up.' " She further testified that she had not heard the voices of any of the other intruders since that night.

¶ 7          Lemual Conley testified that, on the same night, he, defendant, Antonio Trammell, and Emmitt Wright agreed to rob a house where they believed 30 pounds of

marijuana was located. Conley carried a .22-caliber handgun, defendant carried a .38-caliber handgun, and the others were unarmed. After entering the house, Conley grabbed a woman by the arm and took her into the kitchen. He witnessed defendant and Wright going upstairs. He heard a commotion upstairs and heard two gunshots, more commotion, and then two more gunshots. He went upstairs—stepping past Levingston's body—and saw defendant standing in a bedroom, alone. He went back downstairs and heard two more gunshots about 10 seconds apart. Defendant then came downstairs, and they left the house. As they were leaving, someone yelled, " 'Let's get out of here,' " and Conley yelled, " 'G. D. we up.' " He and defendant were then dropped off at the home of Angela Williams, defendant's sister, where he left the .22-caliber firearm in a box in a closet.

¶ 8 Conley acknowledged he wrote a letter while in jail to Steven Hambrick, an acquaintance and inmate at another jail, on March 23, 1998. The letter read to the jury stated: " 'I wouldn't feel so bad if there was another way to get less time than to lie about *** what and who was there; but, man, these punks was talking crazy anyway.' " Conley acknowledged he had sent a letter to Hambrick and written the address on the envelope but denied that those were the contents of the letter he had written. He also stated the letter he wrote was on a different kind of paper. Conley stated he had an agreement with the State that in exchange for his truthful testimony, he would be allowed to plead guilty to home invasion, armed violence, and attempted armed robbery, with a sentencing range of 15 to 45 years. Conley also verified that he provided statements corroborating his testimony at trial to police prior to any deal with the State.

¶ 9 Trammell testified that, on the same night, he, defendant, Conley, and Wright were playing basketball. Defendant stated he knew a man with 40 pounds of marijuana and asked the others if they wanted to go to the man's house to take the drugs and money. Trammell stated

defendant had a .38-caliber revolver and Conley had a .22-caliber revolver. They rode to the house, Trammell put on a ski mask, and they ran inside. Conley took a woman into another room while defendant and Wright went upstairs. Trammell heard defendant ask where "the shit" was and heard a shot and a man in pain. He heard defendant again ask where "the shit" was and heard another shot. He heard a woman say, "[O]h, no, my son," and defendant ask, "[B]itch, where's the shit at?" The defendant then said, "[I]s you playing with me?" and Trammell heard another shot. Trammell then heard something tumble down the stairs. He walked toward the stairs and saw Levingston on the stairwell with blood on his chest and face. He heard defendant say, "[O]h you faking," then he heard another gunshot. Trammell then ran out and entered a car driven by Wright. Trammell also had an agreement with the State that in exchange for his truthful testimony, he would be allowed to plead guilty, with a sentencing range of 15 to 45 years.

¶ 10 Rockford police officer Mike Triplett testified that, on March 20, 1997, three days after the murders, he arrested Conley and observed defendant in a nearby doorway. He and three other officers then pursued defendant. Defendant was eventually found nearby in a bed in Angela Williams's residence, breathing heavily and wearing shoes. He was then placed under arrest.

¶ 11 The jury also heard evidence that the police seized a .22-caliber revolver from a box in Angela's kitchen. The bullets that killed both victims were fired from a .38- or .357- caliber weapon. There were human bloodstains found on the shoes worn by defendant at the time of his arrest consistent with the blood profile of Levingston, with a rarity of 1 in 940,000 Blacks, 1 in 54 million Whites, and 1 in 6.8 million Hispanics. There was also a stain on Conley's shoe matching Levingston's blood profile.

¶ 12 Defendant called Martinez Mineau, who testified that he was a friend of defendant and knew Trammell. He stated he was at his father's house on the morning of March

- 4 -

18, 1997, when Trammell came over and told him he had gone on a robbery with Conley and a man named "Red." He had heard of "Red" but had never seen him. He claimed Trammell stated he went upstairs, shot a man, and then " 'snapped' " and shot a woman. They then ran downstairs, Red said, " 'We up,' " and they left the house. He said Trammell never mentioned defendant or Wright. Mineau also testified that he met Wright for the first time exactly one year later, on March 18, 1998, in a county jail. Two days after meeting Wright, Mineau, for the first time, wrote down the facts Mineau claimed Trammell told him one year earlier. Defendant testified that he and Mineau shared a jail cell in July 1997. Mineau also shared a cell with Wright for two days in September 1997 and from March 20 to 28, 1998.

¶ 13      In rebuttal, Trammell testified that he did not meet with Mineau on these dates, was not a close friend of Mineau, and would not have confided any secrets to him. Furthermore, Trammell claimed he never had any conversations with Mineau about this case. Trammell noted Mineau was a friend of defendant.

¶ 14      Defendant also testified, stating he spent the afternoon and evening of March 17, 1997, at Angela's residence. At around 10 p.m., he claimed he went to the apartment of Tamara Miller. He said he stayed there until about 1:30 p.m. the next day. He testified that Conley was dating Angela and that she was also seeing a man named "Red," whose real name, occupation, and associations he did not know. He stated he encountered Red on March 18, 1997, and Red asked if he could borrow a pair of defendant's shoes, which defendant provided. Defendant stated that on March 20, 1997, he was asleep in his sister's room when police officers woke him up and told him they had a warrant for his arrest. He stated he was not wearing shoes at the time and asked an officer if he could put shoes on while he was being placed under arrest. He claimed to have put on the shoes Red was wearing before he borrowed defendant's shoes because they

were in the vicinity and he did not have the opportunity to find a pair of his own shoes. Defendant then testified that when the police took his shoes, he did not know why they were taking them and did not tell anyone they were not his shoes.

¶ 15    Bruce Scott was called as a rebuttal witness. He testified that in a police interview on March 20, 1997, defendant told him he stayed the night of March 17, 1997, at his sister's residence. According to Scott, when defendant was presented with a statement signed by his sister, the contents of which were not presented to the jury, defendant stated he had actually stayed with Tamara Miller that night. Scott then left for a period, coming back to untruthfully tell defendant that he had spoken with Tamara, who told him defendant was not there that night. Defendant again changed his story, saying he was at his sister's residence. Scott Oswald, another rebuttal witness, was a police officer for the City of Rockford at the time and corroborated this testimony.

¶ 16    The jury found defendant guilty on all four counts. In August 1998, he was sentenced to a term of natural life imprisonment. Defendant directly appealed, and the Second District affirmed. *People v. Williams*, 313 Ill. App. 3d 849, 864 (2000). Defendant filed a petition for postconviction relief in April 2001, which was denied as frivolous in June 2001. Defendant filed three motions for leave to file successive petitions for postconviction relief in November 2010, September 2013, and January 2017, all of which were denied.

¶ 17    In February 2025, defendant filed an additional motion for leave to file a successive petition for postconviction relief, the subject of this appeal. Defendant alleged that he had a meritorious claim of actual innocence based on newly discovered evidence. In support of his petition, he attached signed affidavits from Conway and Cooper.

¶ 18    In his affidavit, Conway stated he met defendant on January 9, 2024, at

Pinckneyville Correctional Center. He stated that on March 18, 1997, at around 1 a.m., he stopped on the same street as the house where the murders took place, and he helped a driver pulled over on the side of the road with his car's hood up. According to Conway, as he was getting jumper cables, he heard two pops come from a house on the corner. He then saw Conley and a "light-skinned" man come running out of the house, and Conley had a gun in his hand. He stated that in April or May 1998, he saw Conley in the Winnebago County jail and asked why he had come running out of the house like that on March 18, 1997. He stated Conley told him he was trying to get out of there and his case involved two murders. He averred Conley further stated he was getting protection if he "testified on a couple guys," and "that was the only way for him to ever get out again." Conway stated he did not know Conley was testifying against defendant at the time.

¶ 19        Cooper stated in his affidavit that on March 18, 1997, in the early morning hours, Conley and a tall, light-skinned male went to his apartment. Conley gave him a .38-caliber revolver and told him to hold it. Conley allegedly stated that they had committed a robbery that "went bad." Later that night, Conley and the other male came to get the gun and asked if Cooper could give them a ride. He claimed to have driven them to the Rock River and seen Conley throw the gun in the water. After dropping the other male off at a Greyhound bus station, he asked Conley what happened, and Conley said the other male snapped when he was hit with a phone and shot two people. He later stated he knew defendant was not involved because Conley told him it was himself, the tall male, and Trammell involved in the robbery. He also stated he later saw defendant going to court and told him Conley had given him the gun used in the robbery and to have defendant's attorney talk to him. However, rather than defendant's attorney coming to speak to him, he claimed Assistant State's Attorney Mark Karner came to see him and

threatened to violate his parole if he said that he took possession of a firearm.

¶ 20    In the trial court, Karner stated he spoke with Cooper, who informed him he intended to invoke his fifth amendment right against self-incrimination (U.S. Const., amend. V). Defense counsel stated that he spoke to Cooper after Karner did because when he spoke to him, "[Cooper] was not a happy camper." Karner stated, "[H]e's going to testify that he took possession of a handgun, and he does have a Fifth Amendment privilege." Cooper's attorney stated Cooper would "invoke his rights under the fifth amendment not to testify to matters which may incriminate himself." The court determined defense counsel could not call Cooper as a witness unless there was a reason besides the issues he wanted to raise.

¶ 21    In May 2025, the trial court entered a written order denying defendant's motion for leave to file a successive postconviction petition, finding the evidence presented in the motion was cumulative of that presented at trial.

¶ 22    This appeal followed.

¶ 23                            II. ANALYSIS

¶ 24    The Act permits any imprisoned person to collaterally attack his conviction based on the substantial denial of his constitutional rights. 725 ILCS 5/122-1(a) (West 2024); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act provides a three-stage process for adjudicating postconviction petitions. *People v. Allen*, 2015 IL 113135, ¶ 21. Only one petition may be filed by a defendant without leave of court. 725 ILCS 5/122-1(f) (West 2024). In order to file a successive petition, "it is the [defendant's] burden to obtain 'leave' before further proceedings on his claims can follow." *People v. Edwards*, 2012 IL 111711, ¶ 24 (quoting *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)).

¶ 25    In this case, the trial court denied defendant's motion for leave to file a successive

postconviction petition. When the court denies a defendant's motion for leave to file a successive petition on a claim of actual innocence, that decision is reviewed *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39. Additionally, the reviewing court may affirm on any basis supported by the record. *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 67; *People v. Johnson*, 208 Ill. 2d 118, 129 (2003).

¶ 26        Leave of court may be granted on two separate bases. First, as codified in the Act, defendants may obtain leave if they demonstrate cause and prejudice. 725 ILCS 5/122-1(f) (West 2024). On appeal, defendant does not argue that he may obtain leave on this basis, and we do not address the issue.

¶ 27        Second, a defendant may obtain leave if there is a fundamental miscarriage of justice. *Edwards*, 2012 IL 111711, ¶ 23. To demonstrate a fundamental miscarriage of justice, the defendant's request for leave and his supporting documentation must demonstrate actual innocence. *Id.* When a defendant seeks leave based on actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the [defendant] that, as a matter of law, the [defendant] cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24. To demonstrate a claim of actual innocence, a defendant's "supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 28        "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.* ¶ 45. At the leave-to-file stage, all well-pleaded allegations in the petition and supporting documents will be accepted as true unless positively rebutted by the record. *Id.* An allegation is positively rebutted if "it is

affirmatively demonstrated by the record that a trier of fact could never accept [its] veracity." *Id.* ¶ 60.

¶ 29    Defendant argues on appeal that his petition demonstrates a claim of actual innocence. We analyze the petition and supporting documentation with respect to each element of actual innocence in turn.

¶ 30                              A. Newly Discovered

¶ 31    Newly discovered evidence is "evidence that was not available at [the] defendant's original trial and that the defendant could not have discovered sooner through diligence." *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Defendant claims the affidavits attached to his petition were newly discovered. He states Cooper's affidavit was newly discovered because his testimony was unavailable at trial and could not have been discovered sooner because of Cooper's invocation of his fifth amendment privilege. He states Conway's affidavit was newly discovered because he did not meet Conway or know he was a witness until January 2024.

¶ 32    The State argues Cooper's affidavit was not newly discovered because defendant was aware of Cooper prior to trial and attempted to call him at trial. The State asserts defendant adequately explains why Cooper did not testify at trial but "fails to explain how this evidence could not have been discovered sooner through diligence." The State relies on *People v. Blackmon*, 2024 IL App (4th) 220808-U, ¶ 29, which states,

> "The record discloses no attempt [the] defendant made to obtain this affidavit from [the witness] for the initial postconviction petition in April 2007. Defendant exhibited no diligence at all to obtain this affidavit at that earlier stage. Accordingly, [the] affidavit does not constitute 'newly discovered evidence' for

purposes of a successive postconviction petition claiming actual innocence." The State says, similarly, that defendant in this case failed to describe an effort to obtain this affidavit.

¶ 33 We find *Blackmon* distinguishable. In *Blackmon*, the affidavit by the witness alleged information unrelated to the invocation of his fifth amendment right, and the court therefore determined it was not a valid excuse for not discovering the evidence sooner. *Id.* Here, in contrast, Cooper's affidavit alleged similar information to what he supposedly would have testified to at trial if he had not invoked his constitutional right to avoid self-incrimination, that is, that he took possession of a firearm. Evidence is newly discovered where "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." *People v. Molstad*, 101 Ill. 2d 128, 135 (1984).

¶ 34 Furthermore, Cooper claimed he was threatened by the State not to testify. This court has held that newly discovered evidence includes testimony from a witness who had been made unavailable to testify through threats or intimidation. See *People v. White*, 2014 IL App (1st) 130007, ¶¶ 20-22. Therefore, since the evidence was not available at defendant's trial and could not have been discovered sooner through due diligence, Cooper's affidavit was newly discovered.

¶ 35 We additionally find Conway's affidavit is newly discovered. Conway alleges he first met defendant in prison in January 2024. There is no evidence defendant would have had a way of knowing about Conway or his testimony prior to this meeting. Therefore, we find the evidence was not available at defendant's trial and could not have been discovered sooner through due diligence.

¶ 36                    B. Material and Noncumulative

- 11 -

¶ 37 To assert actual innocence, supporting evidence must be material and noncumulative. "Evidence is material if it is relevant and probative of the [defendant's] innocence." *Robinson*, 2020 IL 123849, ¶ 47. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009).

¶ 38 Here, the trial court denied defendant's petition because it found "the statements in the affidavit are cumulative of the evidence already presented to the jury." The court stated the affidavits provided evidence already presented to the jury through Mineau. It stated Mineau already provided that "defendant was not present when the shooting occurred and someone else pulled the trigger." Furthermore, it stated, "[T]he jury also heard additional evidence from the defendant that the defendant was not present when the shooting occurred and someone else pulled the trigger."

¶ 39 We disagree with the trial court's ruling. In *Ortiz*, the supreme court held eyewitness testimony supplying a first-person account of the incident that contradicted prior statements of other eyewitnesses was noncumulative, where no other witness at trial offered the same evidence. *Id.* at 336. The affidavits here provided such first-person accounts.

¶ 40 The trial court here distinguished *Ortiz*, explaining, "[T]he jury already heard from Mineau and the defendant what Conway alleges in his affidavit—the defendant was not present at the shooting and someone else pulled the trigger." Similarly, the State argues that because Mineau testified that Trammell said defendant was not present for the murders, any new evidence showing that defendant was not involved was cumulative.

¶ 41 The State and the trial court's scope in analyzing this element is too narrow. The correct standard is not that evidence is cumulative where it is used to prove the same facts as other evidence seen at trial. Using the trial court's standard, any evidence placing defendant

- 12 -

somewhere away from the crime, no matter how compelling, would be inadmissible, since Mineau already provided testimony suggesting defendant was not present at the shooting. This is clearly not correct.

¶ 42        Instead, the correct standard is whether supporting evidence adds to the information presented at trial. *Robinson*, 2020 IL 123849, ¶ 47. The affidavits provided by Conway and Cooper satisfy this standard. Conway's affidavit alleges a firsthand account of what occurred at the scene of the shooting. This was not provided by Mineau's testimony, which only provided a thirdhand account.

¶ 43        Cooper's affidavit also adds to the information presented at trial. It provides alleged statements by Conley not heard at trial about what happened. It also provides information about a potential murder weapon not heard at trial. While both affidavits similarly suggest defendant was not there and did not pull the trigger, they also provide additional information that was not presented at defendant's trial. Therefore, we find the evidence in support of the petition was noncumulative.

¶ 44        We also find both affidavits are material. Conway's affidavit is relevant and probative of defendant's innocence because he saw two people leave the site of the murder, neither of whom were defendant. Cooper's affidavit is also relevant and probative of defendant's innocence because Conley allegedly accused someone other than defendant of the crime and because Conley allegedly disposed of a potential murder weapon.

¶ 45                        C. Conclusive Character

¶ 46        To assert actual innocence, supporting evidence must be "of such conclusive character that it would probably change the result on retrial." *Edwards*, 2012 IL 111711, ¶ 32. The trial court did not address this element because it dismissed defendant's petition as

cumulative. Although we disagree with that finding, we conclude that the supporting evidence is unlikely to change the result on retrial.

¶ 47　　　　　Defendant first argues the supporting evidence is more credible than the testimony of Mineau and defendant because Cooper and Conway were not friends of defendant and therefore were less likely to lie in his favor. We note that it is not appropriate to make credibility determinations at the leave-to-file stage. We must accept the supporting affidavits as true unless positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶ 45. Even accepting the supporting evidence as true, however, we find the evidence against defendant overwhelms it.

¶ 48　　　　　Defendant argues the new evidence undermines Conley's testimony and suggests he was lying. We find it unlikely that a jury would determine Conley was lying in light of the new evidence. Conway avers that Conley told him he was testifying in exchange for protection and for a favorable deal. Conley did not allegedly say he was lying in exchange for a deal. Conway avers that Conley stated, "[Conley's] case was two bodies. Meaning murders," and "[T]hey were giving [Conley] protection if he testified on a couple of guys. He said that that was the only way for him to ever get out again." Conley's alleged statements suggest he would not have testified if he was not given a deal, but this does not mean Conley was lying. He more likely would have been trying to avoid appearing as someone who testifies against others without reason. The jury already knew Conley was testifying against defendant in exchange for a deal. That he told Conway the same thing does little to undermine his credibility.

¶ 49　　　　　Further, while Cooper avers information that would contradict Conley's testimony, it is unlikely to lead a jury to believe Conley was lying under oath. It is more likely that a jury would conclude Conley was lying to Cooper about the "light-skinned" man, as it is

overwhelmed by incompatible evidence. Conley's testimony about the night of the murder was corroborated both by Trammell and Hinton. Trammell stated he and Conley were downstairs when the murders occurred, while Wright and defendant were upstairs. Hinton corroborated Conley's story that he held her at gunpoint and made her look at a wall while the murders occurred. This suggests he couldn't have witnessed the murders, as Conley allegedly purports in Cooper's affidavit. Conley's testimony was also consistent with a statement he gave to police before a deal was made with the State. In addition, blood on defendant's shoes placed him at the scene of the murder. Conley's statements to Cooper, on the other hand, are uncorroborated and allegedly provided shortly after the crime occurred, when Conley may have been in shock or trying to maintain his innocence.

¶ 50　　　　Additionally, that Conley later had possession of a potential murder weapon and disposed of it does not mean defendant was not at the scene of the crime or had possession of the weapon earlier. As discussed above, the evidence overwhelmingly places defendant at the scene of the crime with a .38-caliber firearm.

¶ 51　　　　The State contends Conway's testimony would likely lead a jury to conclude Conway either did not see defendant or left too early to see defendant and not that defendant was never at the scene at all. Defendant argues it is "possible that there were only two intruders, that Conway saw both of them, and that neither one was [defendant]." We find the State's interpretation more compelling. A jury is unlikely to conclude defendant was not present on the night of the murder because the evidence overwhelmingly contradicts this view. Hinton testified that she witnessed at least three intruders in the house. In addition, Conley and Trammell both placed defendant and Wright at the scene of the murder. Lastly, the blood on defendant's shoes placed him at the scene of the crime. We further note that Conway's statements also contradicted

defendant's own theory at trial, which involved at least Conley, Trammell, and a man named "Red." From this, the jury could easily have concluded that either defendant was lying in his testimony, casting doubt on his account of the evening as a whole, or that Conway missed at least one intruder leaving the house that night, casting doubt on *his* respective account. Conway's affidavit therefore does little to support defendant's claim of innocence.

¶ 52 The supporting evidence in defendant's petition, taken as true, does little to change the balance of evidence in this case. It does nothing to undermine that defendant had a victim's blood on his shoes at the time of arrest, that he lied to police about where he was on the night of the murder, or that Conley, Trammell, and Hinton independently corroborated each other's testimony about the events of the murder. We believe the result on retrial would not probably change in light of the new evidence. Therefore, the trial court correctly denied defendant's motion for leave to file a successive postconviction petition.

¶ 53 III. CONCLUSION

¶ 54 For the reasons stated, we affirm the trial court's judgment.

¶ 55 Affirmed.