2020 IL App (1st) 162663-U

No. 1-16-2663

Order filed June 11, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 8756 |
| | ) | |
| ANDY McTILLER, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:   (1) The prosecution did not improperly shift the burden of proof to defendant when it discussed his subpoena power in rebuttal closing argument. (2) Defendant's 16-year sentence for being an armed habitual criminal is not excessive. (3) The trial court erred in imposing an extended-term sentence on defendant's conviction for reckless discharge of a firearm; remand for resentencing is required. (4) We also remand for defendant to file a motion challenging his fines and fees under Illinois Supreme Court Rule 472(e).

¶ 2     Defendant Andy McTiller was convicted of being an armed habitual criminal (720 ILCS

5/24-1.7 (West 2018)) and recklessly discharging a firearm (720 ILCS 5/24-1.5 (West 2018)). The

trial court sentenced him to 16 years in prison on the armed habitual criminal conviction and imposed a concurrent, extended-term sentence of four years on the reckless discharge conviction. The court also ordered defendant to pay various fines and fees.

¶ 3    On appeal, defendant contends that the State improperly shifted the burden of proof by discussing his power to subpoena witnesses in its rebuttal closing argument. He also argues that his 16-year sentence for being an armed habitual criminal is excessive and that the trial court erred in imposing an extended-term sentence on the reckless discharge conviction. Finally, defendant asserts that the trial court miscalculated his fines and fees and failed to award him the proper amount of presentence custody credit.

¶ 4    For the following reasons, we reject defendant's contention that the State improperly shifted the burden of proof during rebuttal closing argument and thus affirm defendant's convictions. We also affirm defendant's 16-year sentence on the armed habitual criminal conviction, finding no abuse of discretion by the trial court. But we vacate defendant's extended-term sentence for reckless discharge of a firearm and remand to the trial court for resentencing to a non-extended term. Finally, under Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), we also remand so that defendant may file a motion challenging his fines and fees in the trial court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    In May 2014, three police officers saw defendant repeatedly firing a gun on a residential street. The State charged defendant with being an armed habitual criminal and recklessly discharging a firearm. "A person commits the offense of being an armed habitual criminal if he

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

*** possesses *** any firearm after having been convicted *** of 2 or more" qualifying felony offenses. 720 ILCS 5/24-1.7(a) (West 2018). "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2018).

¶ 7     At trial, Officers Robert Waterstraat, Kelly Bongiovanni, and Terence Huels testified that they were patrolling the Englewood neighborhood of Chicago in plain clothes and an unmarked police car on an evening in May 2014. At 9:00 p.m., as the officers were traveling west on 69th Street toward Paulina Street, Officer Waterstraat saw three juveniles run across the road and into a convenience store on the northeast corner of the intersection. Officer Waterstraat described the area as a mix of storefront businesses and residential housing, with Paulina Street being primarily residential. Shortly thereafter, the officers heard three or four gunshots, which appeared to come from an area southwest of the officers. As the officers proceeded through the intersection, they saw a man standing on the sidewalk on the east side of Paulina Street, straddling a bicycle and firing a handgun with an extended magazine. Each of the officers identified defendant as the gunman.

¶ 8     Officer Huels made a U-turn on 69th Street, cut through a vacant lot, and headed toward defendant. When defendant saw the officers' vehicle approaching, he lowered his weapon and began pedaling his bicycle south on the sidewalk. Officer Huels attempted to cut defendant off at an alley that intersected with the sidewalk, but defendant made it past the alley in front of the officers' vehicle. Officer Huels then made a right turn, drove onto the sidewalk, and continued to follow defendant. When defendant looked over his shoulder, his bicycle wobbled and the front bumper of the officers' vehicle clipped the bicycle's rear tire, causing defendant to fall off the

bicycle. Officer Huels hit the brakes, swerved to the left, and crashed into several metal poles that lined a vacant lot to the south of the alley.

¶ 9    Officer Waterstraat exited the vehicle and chased defendant on foot as he continued to flee south on Paulina. Officer Waterstraat eventually caught defendant and tackled him to the ground. Defendant struggled to escape, but Officer Waterstraat subdued him with an open-handed strike to the head before handcuffing him. As Officer Waterstraat waited for back-up to arrive, between 40 and 50 people began to emerge from their homes and approach the scene. Fearful that the onlookers might try to help defendant escape, Officer Waterstraat instructed them to stay back. When other officers arrived soon thereafter, Officer Waterstraat stood defendant up, did a protective pat-down search for weapons, and placed defendant in the back of a marked police vehicle. Officer Waterstraat testified that he and his partners did not talk to any witnesses at the scene because no one was cooperative, but he conceded that none of the police reports documented that fact.

¶ 10    Officer Bongiovanni testified that, as defendant initially fled from the officers on his bicycle, she observed him appear to throw something into a small, fenced-in yard. After the crash, while Officer Waterstraat pursued defendant, Officer Bongiovanni went to the yard and saw a handgun with an extended magazine lying in the grass. Officer Bongiovanni noticed several people on a porch behind the apartment building next to the yard and asked them if they were okay. She then entered the yard and found a loaded, semiautomatic handgun. She later recovered seven spent cartridge casings in the area where the officers had observed defendant firing the gun.

¶ 11    Officer Richard McCallum, a uniformed officer who arrived on the scene after defendant had been placed in custody, testified that he removed defendant from the marked police vehicle

and performed a custodial search, during which he found a spent cartridge casing in the front pocket of defendant's sweatshirt. A forensic scientist specializing in firearm identification testified that she examined and tested the handgun that Officer Bongiovanni recovered in the yard and the cartridge casings recovered at the scene and in defendant's pocket and concluded that all of the recovered casings had been fired from the recovered handgun. No fingerprints suitable for comparison were found on the gun or the casings, but an expert in fingerprint recovery testified that finding fingerprints on such items is uncommon.

¶ 12    Before the State rested, the parties stipulated that defendant previously had been convicted of two qualifying felony offenses for purposes of establishing that element of the armed habitual criminal charge. Outside the presence of the jury, the State introduced certified copies of defendant's prior convictions for robbery and unlawful use of a weapon by a felon.

¶ 13    Defendant took the stand and denied having possessed or fired a gun on the night in question. He testified that he was at his girlfriend's house at 6930 South Paulina Street from 6:45 p.m. until around 9:00 p.m., when he decided to ride a bicycle to a store on the corner of 69th and Paulina. While in the store, he heard several gunshots. About 30 seconds after the gunshots ceased, he left the store, got back on the bicycle, and rode south on the sidewalk on the east side of Paulina. He heard an engine behind him and, as he turned to see what was there, was struck and run over by a car. He extracted himself from under the car, stood up, and began to brush himself off when he was tackled to the ground. Although he initially struggled to get away, he stopped resisting when he realized that the person who tackled him was a police officer. The officer handcuffed him, stood him up, and searched his pockets, removing cigarettes and cash from the front pockets of his sweatshirt and a phone from his back pocket. The officer then placed him in a marked police

vehicle. A short time later, a different officer came to the vehicle, reached into defendant's sweatshirt pockets, and said "What's this?" before closing the door and walking away. On cross-examination, defendant testified that he was familiar with the area around his girlfriend's house and knew people who lived on the block. He conceded that "[q]uite a few" of the people he knew came out of their homes during the incident, but he testified that he no longer talks to those people.

¶ 14    In closing argument, the State characterized the case as a credibility contest between the officers who testified to having seen defendant firing a gun and defendant's "Hollywoodesque tale." In defendant's closing argument, defense counsel advanced the theory that the officers accidentally struck defendant with their vehicle while chasing the real gunman and intentionally misidentified defendant as the culprit to cover up their fault for the accident. Defense counsel argued that, even though the officers controlled the crime scene and the investigation, they never documented talking to the 40 to 50 people that they claimed were present during defendant's arrest. Defense counsel asked: "Where are these 40, 50 people? Where is the one resident in the neighborhood *** who is going to come out and say I saw it too[?]" Defense counsel also questioned why the State had not called the people that Officer Bongiovanni testified were on the porch overlooking the yard where defendant discarded the gun, again asking "Where are these witnesses?" Defense counsel stressed that "not one single non-uniform person or non-employment with the State [*sic*] has come in to testify on their behalf."

¶ 15    Addressing defense counsel's argument about the absence of civilian witnesses in its rebuttal, the State cited the officers' testimony that "[n]o one was willing to cooperate." The State also noted that defendant "has the same subpoena power that we do" and that he "knows who those people are." Over defense counsel's objection, the State continued:

"Don't think for one minute if those people out there saw any of this cover-up that they wouldn't have come here and testified because the defense chose to put on a case. We have the burden, but they chose to put on a defense and call witnesses. They called their client. Don't think for one second he couldn't have gotten in contact with the people on the block, a block where his girlfriend lives."

¶ 16    Following closing arguments, the trial court instructed the jury. Among other things, the instructions informed the jury that defendant "is presumed to be innocent of the charges against him" and that the presumption "remains with [him] through every stage of the trial and during your deliberations." Similarly, the court instructed the jury that the State "has the burden of proving the guilt of the defendant beyond a reasonable doubt" and that the burden "remains on the State throughout the case." After deliberating, the jury returned verdicts of guilt on both counts. In a motion for new trial, defendant argued, among other things, that the trial court erred in overruling his objection to the State's comments in rebuttal closing argument concerning his power to subpoena witnesses. The trial court denied the motion.

¶ 17    At the sentencing hearing, the trial court considered a presentence investigation report (PSI) prepared by the probation department, three letters submitted in support of defendant, and testimony from defendant's mother. The PSI indicated that defendant was 42 years old and had four children between the ages of 25 and 11. Defendant reported having a close relationship with his mother and three brothers, one of whom he donated a kidney to. He described a good childhood in which he was raised by his mother in a stable home, but he noted that his father left when he was two years old. According to the PSI, defendant has a 10th-grade education, studied to be a nurse and an electrician, and had a job rehabilitating houses. (At trial, defendant testified that he

worked consistently at various jobs since dropping out of high school at age 16.) The PSI also documented defendant's criminal history, listing convictions for possessing a firearm in 1993; driving under the influence in 1994; robbery in 1995; unlawful use of a weapon by a felon in 1997; domestic battery and violating an order of protection in 1999; aggravated domestic battery in 2008; and domestic battery in 2011.

¶ 18    In one of the letters supporting defendant, correctional officers at the county jail wrote that defendant was a model inmate who was very respectful and did not cause problems. Another letter by fellow inmates stated that defendant regularly attended prayer group meetings and was trying to change his life. The final letter by defendant's cousin described defendant as a nurturing father who was active in the lives of his children and the community. Defendant's cousin also recounted that when she was homeless, defendant allowed her and her children to live with him. Defendant's mother testified that he was a loving son and father. She also explained that, after having back surgery several years ago, she has had to rely on defendant to help her around the house and with errands.

¶ 19    In argument, the State asked the trial court to impose a sentence at the upper end of the sentencing range, which for the armed habitual criminal conviction was six to 30 years in prison. The State argued that a sentence at the high end of the range was appropriate due to the serious harm threatened by defendant's conduct and his documented history of violence. Defense counsel asked the court to impose the minimum sentence of six years. Counsel argued that the letters submitted on defendant's behalf and his mother's testimony showed that he was not a violent person. Counsel also noted that the robbery and unlawful use of a weapon convictions that served as the predicate offenses for the armed habitual criminal charge were from the 1990s and neither

involved the use of a firearm. (Counsel stated that the unlawful use of a weapon conviction stemmed from defendant's use of an M-80 firecracker.)

¶ 20    In a statement in allocution, defendant discussed how his incarceration had been difficult for him and his family. He recounted his consistent work history and stated that he had been mentoring fellow inmates. He conceded that he made mistakes in the 1990s but asserted that he had been "okay" since the 2000s. With respect to his 2008 conviction for aggravated domestic battery, he explained that it arose from a fight with his girlfriend for which he took responsibility by pleading guilty.

¶ 21    Before announcing the sentence, the trial court indicated that it had reviewed the trial transcript and considered the PSI, the letters submitted on defendant's behalf, and defendant's mother's testimony. The court explained that it considered the statutory factors in aggravation and mitigation as well as defendant's character and attitude. The court remarked that it was clear that defendant was loved by his mother and family and was a good and cooperative inmate. The court explained that the jury's verdict (with which the court agreed) had credited the officers' testimony and implicitly rejected defendant's theory that he was the victim of police misconduct. The court recounted how the officers observed defendant firing a semiautomatic handgun down a residential street and described defendant's conduct as "nothing but destructive to the citizens that live in that neighborhood." On the armed habitual criminal conviction, the court indicated that a sentence near the maximum of 30 years would be appropriate based on the nature of the offense and defendant's criminal history. But in light of the evidence in mitigation, the court opted to impose a sentence of 16 years instead. On the reckless discharge of a firearm conviction, the court imposed a concurrent, extended-term sentence of four years. The court also imposed various fines and fees. After the

court denied defendant's motion to reconsider the sentences, defendant filed a timely notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23     Defendant first argues that the State committed prosecutorial misconduct in its rebuttal closing argument by discussing his power to subpoena witnesses, which he contends improperly shifted the burden of proof. The State bears the burden of proof at trial. *People v. Murray*, 2019 IL 123289, ¶ 28. A prosecutor may not attempt to shift that burden to the defendant during closing argument. *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). But a prosecutor's comments in closing argument "will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). A prosecutor's challenged remarks must therefore be viewed in context of the entire record, including the defendant's closing argument. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000).

¶ 24     Our supreme court has held that a "trial court's determination of the propriety of [closing argument] remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *People v. Blue*, 189 Ill. 2d 99, 128 (2000). The supreme court has also held that *de novo* review applies to the question whether prosecutorial comments in closing argument "were so egregious that they warrant a new trial." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). Several decisions of this court have found that the appropriate standard of review for claims of improper closing argument comments is unsettled in light of an apparent conflict between *Blue* and *Wheeler*. See *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 74. But in *People v. Cook*, 2018 IL App (1st) 142134, ¶ 63, we examined the holdings of *Blue* and *Wheeler* and found no conflict between them. Rather, we explained that the abuse of discretion standard applies to a trial court's determination

regarding the propriety of challenged closing argument comments and that *de novo* review governs the separate question whether any improper comments were sufficiently egregious to warrant a new trial. *Id*. ¶ 64. For the sake of completeness, we note that under either an abuse of discretion or *de novo* standard of review, we find that the remarks challenged here were proper.

¶ 25     Viewed in context, it is evident that the State's comments that defendant "has the same subpoena power that we do" and that he could call witnesses that the State did not call were proper as invited responses to defense counsel's remarks highlighting the State's failure to call certain witnesses. Defendant's closing argument focused extensively on the prosecution's decision not to call any civilian witnesses, particularly the people who Officer Bongiovanni testified were on the porch overlooking the yard where defendant discarded the gun or the numerous people that Officer Waterstraat testified were present during defendant's arrest. Defense counsel repeatedly asked where those witnesses were and questioned why the State had not called them, suggesting that their testimony would not have supported the officers' version of events. It was not improper for the prosecutor to respond to that argument by telling the jury that defendant was able to subpoena witnesses and could have called the witnesses himself. See *People v. Kliner*, 185 Ill. 2d 81, 155 (1998) (holding that "prosecutor's comments during rebuttal argument regarding defense counsel's ability to subpoena [a witness] were invited by defense counsel's argument that the State failed to call [the person] as a witness"); *People v. Baugh*, 358 Ill. App. 3d 718, 742 (2005) (where defense argued that the State "had access to certain evidence but failed to use it at trial because it hurt the State's case," prosecutor properly "responded that defendant also had subpoena power").

¶ 26     Nor did the prosecutor's comments shift the burden of proof to defendant. In *People v. Beasley*, 384 Ill. App. 3d 1039 (2008), on which defendant relies, the prosecutor responded to an

argument by defense counsel concerning the State's failure to submit certain evidence for fingerprint testing by saying: "If it's unconscionable on the part of the State not to test certain items for fingerprints, it's just as unconscionable on the part of the defense." (Internal quotation marks and alterations omitted.) *Id.* at 1048. In holding that the remark improperly shifted the burden of proof to the defendant, the appellate court explained that "[a] defendant's failure to submit evidence for analysis cannot be considered 'unconscionable'" because, while a defendant is "*able* to submit evidence for analysis, [he] has no burden to do so." (Emphasis in original.) *Id.* "By describing the defendant's failure to submit evidence as 'unconscionable,' the State implied that the defendant had a burden of proof." *Kelley*, 2015 IL App (1st) 132782, ¶ 66.

¶ 27    In contrast, the remarks challenged here did not suggest that defendant had the burden of proof or any obligation to present evidence. While the prosecutor mentioned that defendant had the *ability* to subpoena witnesses, she did not assert or imply that defendant had an *obligation* to do so. In fact, shortly after discussing defendant's subpoena power, the prosecutor stressed that the State "ha[d] the burden." See *Kliner*, 185 Ill. 2d at 155 (concluding that "prosecutor did not shift the burden of proof to defendant" by commenting on defendant's subpoena power where prosecutor also "acknowledged that the burden of proof was on the State"). Defendant notes that the prosecutor also urged the jury to credit the officers' testimony over his own, but we fail to see how that line of argument (in conjunction with the comment on defendant's subpoena power) could be read to suggest that defendant was required to call witnesses or present evidence in order to prove his innocence. Finally, we note that after closing arguments, the trial court instructed the jury that the burden of proof "remain[ed] on the State throughout the case." In light of that instruction, the prosecutor's comment on defendant's subpoena power cannot be said to have

shifted the burden of proof to defendant. See *United States v. Miller*, 276 F.3d 370, 374 (7th Cir. 2002) ("as long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses").

¶ 28    Defendant next argues that his 16-year sentence for being an armed habitual criminal is excessive. The offense is a Class X felony that has a sentencing range of six to 30 years in prison. 720 ILCS 5/24-1.7(b) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). Defendant asks us to reduce his sentence to something closer to the minimum. We decline that request. "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A sentence within [the] statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 29    Defendant contends that a 16-year sentence is disproportionate to the nature of his offense. He minimizes the seriousness of the offense by focusing on the fact that no one was injured. But even though no one was injured, there is no question that firing a handgun eight times down a residential street is an exceptionally dangerous act that had the potential to cause serious harm to others. Defendant also downplays the nature and extent of his criminal history, characterizing it as mostly non-violent and well in his past. But of defendant's eight prior convictions, we count four—aggravated domestic battery, two domestic batteries, and robbery—that may aptly be described as violent.[2] Whether violent or not, defendant's criminal history is extensive. And while six of his

---

[2] See 720 ILCS 5/12-3.2(a) (West 2018) ("A person commits domestic battery if he or she knowingly *** [c]auses bodily harm to any family or household member[ or] [m]akes physical contact of an insulting or provoking nature with any family or household member."); 720 ILCS

prior convictions were from the 1990s, his 2008 conviction for aggravated domestic battery and 2011 conviction for domestic battery were both of recent vintage when he committed his current offenses in 2014.

¶ 30    Defendant argues that the trial court improperly considered his failure to admit guilt as an aggravating factor when it discussed his contention that he was a victim of police misconduct. But the court simply explained that the jury's verdict implicitly rejected defendant's theory and instead credited the officers' version of events, which the court then went on to discuss when describing the nature of defendant's offense. Noting in the record suggests that the court accorded aggravating weight to defendant's failure to admit guilt.

¶ 31    Defendant cites the mitigation evidence offered at the sentencing hearing, including his age, work history, family ties, good conduct and mentorship of fellow inmates while incarcerated, and his disabled mother's reliance on him for assistance. But the trial court considered this evidence and gave it significant mitigating weight in determining defendant's sentence. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19 ("Where mitigating evidence is presented to the trial court, it is presumed, absent some indication to the contrary, other than the sentence itself, that the court considered it."). The court explained that, while a sentence of close to 30 years would have been appropriate based on the nature of the offense and defendant's criminal history, the evidence in mitigation justified a lesser sentence of 16 years. We will not reweigh the evidence or the aggravating and mitigating factors and substitute our judgment for that of the trial court.

---

5/12-3.3(a) (West 2018) ("A person who, in committing a domestic battery, knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated domestic battery."); 720 ILCS 5/18-1(a) (West 2018) ("A person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force.").

*Alexander*, 239 Ill. 2d at 213. The trial court's sentence is within the statutory range and not "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54. We thus cannot say that the sentence is excessive or that the trial court abused its discretion.

¶ 32    Next, defendant contends (and the State agrees) that the trial court erred in imposing an extended-term sentence of four years on defendant's reckless discharge of a firearm conviction. Reckless discharge of a firearm is a Class 4 felony that ordinarily carries a sentencing range of one to three years in prison, but a trial court can impose an extended-term sentence of three to six years if certain aggravating factors are present. 720 ILCS 5/24-1.5(c) (West 2018); 730 ILCS 5/5-4.5-45(a) (West 2018). However, our supreme court has held that when a defendant is convicted of multiple offenses arising from a single course of conduct, the trial court may impose an extended-term sentence only on the offense or offenses that are within the most serious class of offense of which the defendant was convicted. See *People v. Bell*, 196 Ill. 2d 343, 355 (2001); *People v. Jordan*, 103 Ill. 2d 192, 205-06 (1984). Because defendant was convicted of the Class X felony of being an armed habitual criminal, and because that conviction and his reckless discharge of a firearm conviction arose from the same course of conduct, the trial court was not authorized to impose an extended-term sentence on the reckless discharge conviction. We must therefore vacate defendant's extended-term sentence for reckless discharge of a firearm.

¶ 33    Beyond that, the parties disagree about the proper remedy. Defendant asks us to impose a term within the non-extended range (but not necessarily the maximum) or remand to the trial court for resentencing. The State requests that we impose the maximum, non-extended term of three years. Where "a trial court improperly imposes an extended term, but it is clear from the record

[that] the trial court intended to impose the maximum available sentence, we may use our power under Illinois Supreme Court Rule 615(b)(4), to reduce the sentence to the maximum nonextended term sentence." *People v. Ware*, 2014 IL App (1st) 120485, ¶ 32. On the record here, we cannot say that the trial court intended to impose the maximum available sentence on defendant's reckless discharge conviction. The four-year sentence that the court imposed on that conviction was two years below the maximum of the extended-term range to which the court believed defendant was subject. The court also imposed a sentence well below the maximum on defendant's armed habitual criminal conviction. We thus remand to the trial court for resentencing on defendant's reckless discharge conviction.

¶ 34   Finally, defendant argues that the trial court miscalculated his fines and fees and failed to award him the proper amount of presentence custody credit. Illinois Supreme Court Rule 472 specifies the procedure for challenging a trial court's imposition or calculation of fines and fees, its application of *per diem* credit against fines, and its calculation of presentence custody credit. See Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019). The rule provides that "[n]o appeal may be taken by a party from a judgment of conviction on the ground of any sentencing error specified above unless such alleged error has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. Mar. 1, 2019). Instead, "the circuit court retains jurisdiction to correct [such] sentencing errors at any time following judgment and after notice to the parties, including during the pendency of an appeal." Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019).

¶ 35   Defendant concedes that he did not challenge his fines and fees or presentence custody credit in the trial court, but he asks us to consider the issues in this appeal because he filed his notice of appeal and opening brief before Rule 472 became effective. In *People v. Barr*, 2019 IL

App (1st) 163035, ¶¶ 6-15, this court held that Rule 472 applied only prospectively to appeals that were initiated after the rule's effective date. However, our supreme court has since amended Rule 472 to expressly provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). We have held that Rule 472(e) applies "to all cases pending on appeal as of March 1, 2019." *People v. Taylor*, 2019 IL App (1st) 160173, ¶ 46; see *People v. Williams*, 2020 IL App (1st) 163417, ¶¶ 91-94. Because defendant's appeal was pending on March 1, 2019, we must remand to the trial court to allow defendant to file a motion challenging his fines and fees.

¶ 36                                    III. CONCLUSION

¶ 37     For the foregoing reasons, we affirm defendant's convictions and his 16-year sentence for being an armed habitual criminal. We vacate defendant's extended-term sentence for reckless discharge of a firearm and remand to the trial court for resentencing to a non-extended term. On remand, defendant may also file a motion challenging his fines and fees under Illinois Supreme Court Rule 472.

¶ 38     Affirmed in part; vacated in part; remanded with directions.