2021 IL App (2d) 190660-U
No. 2-19-0660
Order filed September 22, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-1989 |
| | ) | |
| JIM BUCKINGHAM, | ) | Honorable |
| | ) | Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Bridges and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Plain-error review of defendant's forfeited claims was not warranted where: (1) the record demonstrated that any error in the State's use of text messages in rebuttal closing argument was invited, and (2) defendant affirmatively acquiesced in instructing the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014). Affirmed.

¶ 2    Following a jury trial, defendant, Jim Buckingham, was convicted of one count of criminal

sexual assault and one count of criminal sexual abuse. Defendant appeals his convictions, arguing

that the State's use of certain text messages in rebuttal closing argument was reversible error and

that the trial court abused its discretion by instructing the jury in accordance with Illinois Pattern

Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) ("Proof of Other Offenses or Conduct") (hereinafter IPI Criminal No. 3.14). For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     Defendant was indicted for charges arising out of a June 5, 2017, incident involving J.V.— a tenant and maintenance worker at the apartment building defendant managed. The two-count indictment alleged: (1) criminal sexual assault—knowingly committed an act of sexual penetration by the use of force or threat of force, in that defendant penetrated the vagina of J.V. with his finger (720 ILCS 5/11-1.20(a)(1) (West 2016)); and (2) criminal sexual abuse—knowingly, by use of force or threat of force, touched the breast of J.V. for his own sexual gratification (720 ILCS 5/11-1.50(a)(1) (West 2016)).

¶ 5                           A. Pretrial Proceedings

¶ 6     The parties engaged in extensive pretrial motion practice, as discussed in relevant part below.

¶ 7                       1. Section 115-7.3 Motions *in Limine*

¶ 8     The parties filed competing motions *in limine* regarding the admission of uncharged sexual acts by defendant against J.V. Namely, the State sought to introduce evidence that, on separate occasions prior to the June 5, 2017, incident, defendant made sexual advances to and sexually harassed J.V. by hugging her, slapping her buttocks, grabbing her face and trying to kiss her, and entering J.V.'s apartment when she was not there. The State argued that the evidence was admissible to show defendant's propensity pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2016)), and to show motive, opportunity, intent, identity, and absence of mistake pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). Defendant argued that the evidence would be unduly prejudicial and deny him a fair trial.

The trial court ruled that the evidence was admissible under section 115-7.3 and under Rule 404(b) to show proof of opportunity, intent, and absence of mistake or accident with respect to the charged offense.

¶ 9                    2. Text Messages Motions *in Limine*

¶ 10    The parties filed competing motions *in limine* regarding the admissibility of photographs (taken by the Rockford City Police Department) of a text-message conversation on J.V.'s cell phone. The text messages were exchanged between J.V. and witness Leo Sisti shortly after the incident. Sisti was the apartment building's security officer and a tenant there. The text messages also referred to fellow tenant Walter Leary. The photographs of the text-message conversation reflect the following content and time stamp:

4:39 p.m. [Sisti]: "Look out Jimmy's coming for you"

4:39 p.m. [J.V.]: "I'm not home. I'm hiding"

4:44 p.m. [J.V.]: "That wasn't cool bro."

4:45 p.m. [J.V.]: "Very awkward for me to say the least."

4:51 p.m. [Sisti]: "You OK"

4:53 p.m. [Sisti]: "???"

4:53 p.m. [Sisti]: "Hello"

4:54 p.m. [J.V.]: "I'm with Walt"

4:55 p.m. [Sisti]: "Thank you I feel better"

5:37 p.m. [Sisti]: "You're safe"

5:38 p.m. [J.V.]: "Yea. I'm making cigs."

5:38 p.m. [J.V.]: "He IS still here tho"

5:39 p.m. [J.V.]: "I don't feel safe alone Leo. I'm dead serious"

5:42 p.m. [Sisti]: "Should I come back Up"

5:43 p.m. [J.V.]: "Yes"

5:43 p.m. [J.V.]: "Now"

5:43 p.m. [J.V.]: "He's outside my door"

5:46 p.m. [Sisti]: "Where you at"

5:46 p.m. [J.V.]: "Where are you"

5:47 p.m. [Sisti]: "In front of Walters door"

¶ 11    The State sought to introduce the text messages through the testimony of J.V. and Sisti. The State argued in relevant part that the text messages were being introduced to corroborate the timeline of events, not to prove the truth of the matter asserted and were thus not hearsay. Defendant argued that the messages constituted inadmissible hearsay and that any testimony regarding the text messages at trial would be unfair bolstering and cumulative of J.V.'s and Sisti's testimony. The trial court reserved ruling on the issue.

¶ 12                                    B. Trial

¶ 13    The State called J.V., Sisti, Leary, and Rockford police detective Donald Dulgar as witnesses. Dulgar interviewed J.V., Sisti, Leary, and defendant on several occasions in June and July 2017. Defendant testified on his own behalf and also called John Galbo—the apartment building's assistant manager—as a witness.

¶ 14    The evidence established that J.V. performed maintenance at the apartment building defendant managed in exchange for a rent-free apartment. She started the job and moved there in April 2017. Defendant did not live in the building but had an office in the building's basement and a master key to the apartments. Defendant was J.V.'s supervisor and assigned her daily work. J.V. testified regarding interactions with defendant preceding the June 5, 2017, incident, as follows:

"Q. Was [defendant] always professional with you?

A. Mm-mm, no.

Q. No. What was unprofessional?

A. Um, there's just a few times where he would come on to me in type of different ways that I felt uncomfortable, like—

Q. Did he physically come onto you?

A. Yes.

Q. And what did he touch you?

A. Yes.

Q. Where did he touch you?

A. My, smacked my rear.

Q. Smacked your rear.

A. Come up to my face and bring it close to his, you know, I guess, I don't know why, but—

Q. Did he make comments to you of a sexual nature?

A. I really don't remember."

J.V. further testified that, on two occasions prior to the June 5, 2017, incident, defendant entered her apartment without her permission while she was not there.

¶ 15    Regarding the June 5, 2017, incident, the evidence established that, in the late afternoon on that date, J.V., Sisti, and defendant were in Sisti's apartment, although their testimony varied as to the precise timing of defendant's arrival and the amount of beer consumed. We recount the testimony regarding the content of their conversation and ensuing events.

¶ 16    J.V. testified that defendant commented on his wife's breasts, to which she responded, "there's nothing wrong with them." The topic of the conversation turned to "bras and panties and things." J.V. said that women sometimes did not wear bras or panties. Defendant responded, "[L]et me see, let me see, what do you got under there?" Defendant approached J.V. She told defendant to "stay away from [her]" and tried to leave. Defendant grabbed J.V.'s shirt collar, reached down her shirt, and touched her breast. He also unbuckled his own pants.

¶ 17    At this point, J.V. testified, Sisti gave J.V. a pair of nunchucks, but J.V. gave them to defendant. Defendant then pushed J.V. into a chair, stood over her, and inserted the tip of his finger into her vagina. J.V. testified that she "was scared out of [her] mind." She called out to Sisti, asking "[a]re you going to let this happen to me right now?" Sisti then pulled defendant off J.V., and J.V. ran out of the apartment and down a flight of stairs toward her apartment. However, she heard someone behind her, assumed it was defendant, and hid under the staircase. When she heard the person open her apartment door, she retreated upstairs to Leary's apartment. She testified that she was panicked, scared and confused.

¶ 18    J.V. testified that she and Sisti began a text-message conversation as soon as she ran out of his apartment. The trial court sustained defense counsel's objection to J.V.'s testimony that the exchange began with Sisti telling her to "look out." At a sidebar outside the presence of the jury, the State argued that the text-message conversation was admissible "under the present sense impression [] exception" and indicated her "then existing mental and emotional state." The trial court ruled that the text messages were admissible to explain her actions after the incident. However, the trial court further ruled:

"But I agree with the defense that substantively, particularly putting statements in Mr. Sisti's mouth that aren't intended for but not testifying [*sic*]. Those are generally inadmissible.

The front end of it, though, as to warning and a perception of, again, as good of all any, but I'm going to hold right now because the way the testimony, she went downstairs, she looked at her phone and she had a message. So at least as to the fact of or even if she needs to be professional, she needs to testify on whether Leo said to her. He got in contact with her is for a non-hearsay purpose and I'll allow it.

On the other hand, subject to further argument, I'm not allowing the whole text message conversation to be used for anything other than refreshing recollection and then only if there's any foundation for it.

¶ 19     The State proceeded to show J.V. People's Exhibit Nos. one to six, which she identified as photographs of her cell phone displaying the June 5, 2017, text-message conversation between her and Sisti. J.V. testified regarding the content of some of her text messages to Sisti, including that she answered Sisti's first text message and said that she was hiding under the stairwell, that she was not safe, and "that was not cool."

¶ 20     J.V. testified that, when she reached Leary's apartment, she was crying and told Leary that defendant had put his hand down her shirt and his finger up her skirt. Leary told her to "calm down" and that "everything is okay." A few minutes later, J.V. heard a knock on Walter's door and defendant's voice saying, "I can hear my employees in there and I know [J.V.] is in there." J.V. hid in Walter's closet. She heard defendant argue with Leary at the front door about "some voucher for [Sisti's] free housing and that he was going to have to move." Defendant left after a couple of minutes. J.V. remained in Leary's apartment until about 3:30 a.m. or 4 a.m., although

she and Sisti went to her apartment at one point and "rolled cigarettes." When she did that, she heard defendant outside her door and saw his car outside. Leary walked J.V. to her apartment at 3:30 a.m. or 4 a.m. and sat outside her door so that J.V. could sleep. J.V. did not know whether defendant was in the building at that point.

¶ 21    J.V. testified that she stayed in bed for two days following the incident. During this time period, she called her mother and a crisis hotline and told them about the incident. At some point in the following days, she told the building owner about the incident, and he told her that defendant had been banned from the property. At another point in the following days, J.V. met with defendant, Galbo, and Sisti. Defendant told J.V., "If you think you're going to blackmail me you have another thing coming." He also told J.V. that he would cease his "prior conduct" and would not evict her if she "drop[ped] any type of charges." J.V. further testified that, after the meeting, her workload increased to an unattainable level. On June 11, 2017, J.V. reported the June 5, 2017, incident to the police. J.V. testified that, in July 2017, she found an eviction notice on her apartment door. However, she testified that she went to court and the case was dismissed.

¶ 22    On cross-examination, J.V. acknowledged that she did not immediately report the incident to the police. J.V. also denied that she had in fact been served with an eviction notice on June 7, 2017—four days before reporting the incident. Rather, J.V. explained, on June 7, 2017, Galbo (the assistant building manager) verbally informed J.V. that her boyfriend was banned from the property. However, J.V. also acknowledged that she filed a complaint for an order of protection against all of the "people who were bothering me"—including defendant and Galbo—and that she alleged in the complaint that Galbo served her with an eviction notice on June 7, 2017. J.V. testified that she ultimately withdrew the complaint after learning that the terms of defendant's bond in this

case prohibited contact with J.V. J.V. further denied on cross-examination that she was in a dating relationship with Sisti.

¶ 23 During the State's redirect-examination of J.V., at a sidebar conference outside the presence of the jury, the State requested a ruling that defense counsel had opened the door to admit the photographs of the text messages in People's Exhibit Nos. one to six as prior consistent statements. Namely, the State argued that defense counsel's cross-examination of J.V. raised a claim that J.V. fabricated the charges after she was served with an eviction notice. The trial court agreed and allowed the State to use the text messages "for the purpose of rebutting [] the recent fabrication and subject to foundation about questioning on that issue."

¶ 24 J.V. proceeded to testify regarding the content of her messages to Sisti. She explained that she received a text message from Sisti at 4:39 p.m. and responded that she was not home and was hiding. J.V. further testified that, in 4:44 p.m. and 4:45 p.m. text messages to Sisti, she wrote, "that wasn't cool, bro" and was "very awkward for me to say the least." At 4:54 p.m., J.V. wrote that she was "with Walt." At 5:38 p.m., J.V. wrote that she was "making cigs," that defendant was still there, and that she did not "feel safe alone Leo, I'm dead serious." J.V. further testified that, in her last text message at 5:43 p.m., she wrote that defendant was outside her door.

¶ 25 Sisti testified regarding the June 5, 2017, incident. Sisti testified that, prior to defendant's arrival, he and J.V. had smoked marijuana. According to Sisti, after defendant arrived and the three began to converse, J.V. "blurted out" that she would like to suck defendant's wife's breasts. J.V. also stated that she was not wearing underwear. Defendant responded, "[L]et's find out," and approached her. Sisti testified that defendant began tickling J.V. and "playfully" groping her and that J.V. was "snickering." Sisti testified that he was upset because he and J.V. were "intimate" at the time. He explained that he gave J.V. a pair of nunchucks and thought she would use them to

defend herself. However, she handed the nunchucks to defendant, and he threw them on the ground. "[T]he groping continued," and Sisti thought that J.V. "was enjoying it." Therefore, Sisti testified, he "just sat down and watched the show"—which lasted "around seven minutes." Sisti testified that, at one point, J.V. "comes by and goes by the recliner, Jim pushes her into the recliner and he puts his hand up her skirt and down her shirt." Sisti could not see where defendant touched J.V. on her body. Sisti testified that J.V. then turned to him and said, "are you going to allow him to keep doing this to me?" Sisti put his hand on defendant's shoulder and told him he needed to stop. Defendant stood up and stopped touching J.V.

¶ 26    Sisti testified that defendant proceeded to grope him and put a $20 bill down Sisti's shirt. Sisti testified that J.V. "seemed to think that that money should have been hers. And that's what really triggered her to get pissed off." Sisti testified that J.V. left his apartment five minutes later. Sisti acknowledged that he never told the police about the $20 bill and groping. He explained: "I didn't think—what happened to me is irrelevant to what happened to [J.V.]. Why would I tell you a story about me. I'm not the one filing charges against the man. I can defend myself."

¶ 27    Sisti testified that, shortly after J.V. left the apartment, defendant left and said that he was going to try to find her. Sisti became concerned and sent text messages to J.V. Defense counsel objected to the admission of Sisti's text messages to J.V. At a sidebar outside the presence of the jury, the trial court stated that the text messages had been admitted only to rebut the charge of recent fabrication. The State responded that it sought to lay the foundation for J.V.'s text messages by establishing that Sisti was the person sending the text messages to J.V.'s phone. The trial court allowed the text messages to be used for foundational purposes. The prosecutor clarified, "So, the Court's ruling that I can't get into the content with this witness but I certainly can tie up the foundational issues." The trial court responded: "Yeah, at least on content at least right now."

¶ 28    Sisti proceeded to identify the text messages in People's Exhibit Nos. one to six as messages he sent to and received from J.V. shortly after the incident. He testified that, after the text-message conversation, he went to Leary's apartment. J.V. was there and seemed "rattled." Defendant knocked on Leary's door, and defendant and Leary had a conversation about a phone call defendant had received regarding Sisti.

¶ 29    Leary testified that, at about 5:00 p.m. or 6:00 p.m., J.V. knocked on his apartment door and ran in. She was crying and looked "frantic" and "terrified." She told Leary that defendant had "tried to attack" her. J.V. hid in the closet. Shortly thereafter, Sisti arrived at Leary's apartment. Leary described Sisti's demeanor as "kind of dazed" and responded that Sisti appeared "concerned or fearful." After Sisti's arrival, defendant knocked on Leary's door and said he was the "sheriff." Defendant asked to talk to J.V. and Sisti. At Leary's direction, Sisti left the apartment with defendant.

¶ 30    Leary testified that, at approximately 3:00 a.m. or 4:00 a.m., he escorted J.V. back to her apartment. Leary testified that he then "went outside in the outside stoop and sat outside till 4:00 o'clock in the morning." While on the stoop, he saw defendant's car in the parking lot.

¶ 31    Defendant testified on his own behalf. At the outset, he denied that he ever "smacked [J.V.'s] rear," tried to grab her, or made sexual advances toward her. He also denied that he ever entered J.V.'s apartment when she was not there. Defendant described his relationship with J.V. as "playful and fun," but never sexual.

¶ 32    Defendant proceeded to testify regarding the June 5, 2017, incident. On that date, he went to Sisti's apartment during the late afternoon—an event that was "not unusual." Both Sisti and J.V. were there. Defendant testified that, in the first few sentences of their conversation, J.V. stated that she "would really like to suck [defendant's] wife's boobs." There had been no conversation of a

sexual nature prior to J.V.'s statement. Defendant testified that J.V. repeated the statement and made "sound effects." J.V. later stated that she was not wearing any underwear. According to defendant, J.V. then started to dance around the room, and he danced with her. Defendant explained that J.V. put her hands out and he tried to grab them. He may have accidentally touched J.V.'s breast in the process. J.V. continued to dance and lifted up her skirt. Defendant took hold of the bottom of her skirt and continued to dance.

¶ 33    At this point, defendant testified, he heard J.V. ask Sisti, "Leo are you going to let him do this to me?" Defendant dropped J.V.'s skirt, and Sisti tapped defendant on the shoulder. Defendant testified that he realized at that moment that Sisti and J.V. were in a relationship. Defendant stopped dancing with J.V. and sat down. J.V. never appeared uncomfortable during their encounter and left the apartment at some point. Defendant testified that he did not touch J.V. under her skirt. In response to the question of whether his hands ever went up J.V.'s skirt, defendant replied, "[n]o, I did not go in – no, I was just on the parameter [*sic*]." Regarding J.V.'s testimony that defendant reached his hand into J.V.'s skirt and penetrated her vagina, defendant stated, "[s]he is a liar." Throughout his testimony, defendant continued to refer to J.V.'s accusations as lies. Defendant further specified that he did not wear a belt, so he could not have unbuckled one. He also testified that he was incapable of acting sexually toward J.V. because he suffered from erectile dysfunction.

¶ 34    Defendant testified that he left Sisti's apartment shortly after J.V. left. He went to his office in the basement of the apartment building and heard a message on the answering machine regarding Sisti's veteran housing benefits. Defendant went upstairs, found Sisti in Leary's apartment, conversed about the message, and then left. Defendant testified that he did not spend the night at the building.

¶ 35    Defendant acknowledged that he subsequently participated in a meeting with J.V. and Galbo during which he was "indirectly" asked to resign and responded that he would not be blackmailed. Defendant also acknowledged that he signed an eviction notice against J.V. on July 10, 2017. He testified that he was aware of J.V.'s allegations at the time but had not been involved in the eviction decision.

¶ 36    Galbo testified that, in the first two weeks after being hired and moving to the apartment building, J.V. performed no work. Galbo discussed the job obligations with J.V. However, J.V.'s deficient performance continued, and Galbo conversed with her weekly regarding the issue. Galbo testified that, a few days after June 5, 2017, J.V. told him about the incident and said that she would not report it to the police if defendant resigned. Galbo convened a meeting with J.V. and defendant. Defendant did not admit to any inappropriate conduct, agreed to treat J.V. professionally, and told J.V. that he would not allow her to blackmail him.

¶ 37    Galbo acknowledged that he participated in eviction proceedings against J.V. in July 2017. He denied that the proceedings were related to J.V.'s allegations against defendant. Rather, Galbo testified, the proceedings were initiated because J.V. failed to perform the requisite maintenance work and had an unauthorized person living with her in the apartment.

¶ 38    Prior to closing arguments, the State orally moved to admit People's Exhibit Nos. one to six. Defense counsel responded, "Judge, we have no objection. Well, let me put it this way. I would object for the record for reasons previously stated." The trial court admitted the exhibits, stating: "So People's Exhibits 1 through 6, having been litigated prior during the motions *in limine* phase of the trial, admitted over the defense objection for the reasons previously argued." Defense counsel subsequently inquired, "Now the question, Judge, as to 1 through 6. Is that something the Court is intended to go back to the jury? In other words, I guess, is that something the parties are

intending to use during closing arguments[?] They've been admitted." The trial court responded that, "once an exhibit is in evidence, it's in evidence. It's something the jury gets to consider." Defense counsel replied, "All right. Very good. Thank you." The State continued, "So we're asking you to publish the text messages, both of the text messages. I would ask to essentially publish everything that we've talked about that has been admitted ***." The trial court stated, "Again, once an exhibit is in evidence, I think it is [capable] of being used by either party in argument to the jury and it should return to the jury room with the jury."

¶ 39                                     C. Closing Arguments

¶ 40     We recount the relevant portions of defendant's closing argument and the State's rebuttal closing argument.

¶ 41                              1. Defendant's Closing Argument

¶ 42     Defense counsel argued that J.V. "lied" regarding the timing of her arrival at Sisti's apartment on the day of the incident and the nature of her relationship with Sisti. Defense counsel also argued that J.V. was trying to "game the system" to avoid eviction. Specifically:

> "[J.V.] is trying to game the system. She sat up there yesterday and from last June gaming the system trying to play all of us, particularly each and every one of you, ladies and gentlemen, for fools.
>
>                                          * * *
>
> And she testified[,] [s]he had nowhere else to go. That's a strong [incentive] to make these allegations, to game the system.
>
>                                          * * *

[J.V.] initiated a series of events in June of 2017 for her own personal gain and agenda. And in the process has falsely accused Mr. Buckingham of committing *** horrible, horrible acts."

¶ 43    Defense counsel proceeded to reference People's Exhibit Nos. one to six:

"You will be presented with text messages. The State is going to argue well immediately or shortly after that, Leo and [J.V.] started texting each other. And Leo texted her, look out Jimmy is coming for you. Now Leo is the security guy. We heard that he and [J.V.] were in the relationship. Not only is he the security guy but that's somebody he's in the relationship with. If he had reasonably believed that [J.V.] had just been attacked or assaulted by Mr. Buckingham [defendant], look out Jimmy is coming for you, is the least of what a reasonable person in that situation would have done.

Think about the [sic] Leo Sisti's situation at that point. The State is asking you to find he witnessed and believed that Mr. Buckingham had assaulted [J.V.]. He believes, he thinks he's going after her, look out []he's coming for me, for what? To attack her again. You're the security guy and that's somebody you are in the relationship with but he stays in his apartment. He did not go after her because there was no reason to believe on behalf of Mr. Sisti that Mr. Buckingham was either going after her or that she had been assaulted and he was going to track her down because a reasonable person who had just witnessed a sexual assault or sexual abuse wouldn't have acted that way. And then she says she was hiding and that wasn't cool.

Now I ask you to consider [J.V.]'s actions and text messages after. That wasn't cool, bro, to Mr. Sisti. And the[n] she says very awkward for me to say the least. Well,

what was awkward. Again, I ask you to use your common sense and reasonable inference to be drawn from the evidence and testimony presented.

We have somebody who is at least telling us here that she's victim of the sexual assault and sexual abuse. That's a pretty heavy thing to allege and say. But her immediate, immediate almost statement to the guy she's in the relationship with, that was awkward for me to say the least. Is that the language somebody would use? I would ask you to consider that."

¶ 44                          2. State's Rebuttal Closing Argument

¶ 45     In rebuttal, the State recounted the circumstantial evidence presented and proceeded to read from text messages in People's Exhibit Nos. one to six:

"What else? Leo texted [J.V.] to warn her and to make sure she was safe.

4:39 p.m., the first text. Look out Jimmy is coming for you. If nothing happened, if this is all fabricated, why did Leo text that to [J.V.]. Why? Look out, Jimmy is coming for you. She heard footsteps, she made the assumption that it was Jim Buckingham coming down the hallway behind her. Why wouldn't she think that? Because Leo said, look out, Jimmy is coming for you.

4:39 p.m. she texted back. I'm not home I'm hiding.

4:44 p.m. she texts him, that wasn't cool, bro. He's her bro not her brother.

4:45 p.m. she texts him, very awkward for me to say the least.

4:51 p.m. he again inquires, you okay?

4:53 p.m. question mark, question mark, question mark.

4:53 p.m. hello. Where are you?

4:54 p.m. I'm with Walt.

4:55 p.m. Leo say[s] thank you, I feel better.

Then 5:37 p.m. he says you're safe?

5:38 p.m. Yes. I'm making cigarettes.

5:38 p.m. he is still here though.

5:39 p.m. I don't feel safe alone, Leo, I'm dead serious.

5:42 p.m. Leo says should I come back up, insinuating he's already been up there.

5:43 p.m. she says, yes.

5:43 p.m. she says, now.

5:43 p.m. he's outside my door.

5:46 p.m. he says, where are you at?

5:46 p.m. she says where are you?

5:47 p.m. he says I'm in front of Walter's door.

That is quite a series to fabricate with your friend to support your claim of sexual assault to take down Jim Buckingham."

¶ 46                    D. Jury Instruction Conference

¶ 47     The jury instruction at issue is IPI Criminal No. 3.14. The State's proposed version of the instruction provided in relevant part that the jury could consider evidence of defendant's uncharged conduct "on the issues of the defendant's propensity to commit the crimes as well as the defendant's intent, motive and lack of mistake and may be considered by you only for that limited purpose" and that "[i]t is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of the defendant's propensity to commit the crimes as well as the defendant's intent, motive and lack of mistake." Defense counsel objected to the "propensity" reference.

2021 IL App (2d) 190660-U

¶ 48    The trial court initially reserved ruling and then drafted its own version of IPI Criminal No. 3.14., replacing "defendant's propensity to commit the crimes" with "character of the defendant in order to show action in conformity therewith" and striking the second reference to "propensity to commit the crimes." The trial court reasoned that the language conformed with both section 115-7.3 and Rule 404(b) and noted, "I don't really detect any disagreement, a form of the instruction on other conduct is warranted." Both parties objected to the trial court's version. However, defense counsel agreed to the use of "some form" of IPI Criminal No. 3.14 and proposed that the instruction read that "the evidence has been received on the issue of defendant's intent, motive and lack of mistake and may be considered by you for only that purpose." In response to his position with respect to the trial court's version, defense counsel further stated:

> "On the issue of the character of the defendant in order to show action and
>
> conformity therewith, to commit the crimes as well as the defendant's intent, okay.
>
> Without waiving my previous objection as to the other things I had objected to I'm
>
> fine with the language of your Honor's proposal."

¶ 49    In ruling that it would instruct the jury pursuant to its own version of IPI Criminal No. 3.14, the trial court stated that it rejected the State's proposed version and rejected defendant's request to exclude any propensity language. Accordingly, the trial court instructed the jury as follows:

> "Evidence has been received that the defendant has been involved in conduct other
>
> than that charged in the indictment.
>
> This evidence has been received on the issues of the character of the defendant in
>
> order to show conformity therewith, as well as the defendant's intent, motive and lack of
>
> mistake and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of the character of the defendant in order to show conformity therewith, as well as the defendant's intent, motive and lack of mistake."

¶ 50                                E. Jury Verdict

¶ 51    Following deliberations, the jury returned a verdict of guilty of one count of criminal sexual assault and one count of criminal sexual abuse.

¶ 52                             F. Posttrial Proceedings

¶ 53    Defendant filed a motion for a new trial. He challenged the sufficiency of the evidence; argued that he was deprived of a fair trial by an impartial jury and that the verdict was the result of insufficient deliberation, contrary to the law and evidence, and the result of the passion, bias, and prejudice against defendant; and that the trial court erred in admitting J.V.'s and Sisti's text-message conversation. Prior to the hearing on the motion for a new trial, defendant obtained new counsel who adopted the motion. During the hearing on the motion, the trial court asked defense counsel whether he was raising any challenge to the jury instructions. Defense counsel responded that he was not. After the parties' arguments, the trial court denied the motion for a new trial.

¶ 54    Following a sentencing hearing, the trial court ultimately sentenced defendant to consecutive prison terms of 5 years and 22 months, respectively. Defendant timely appealed.

¶ 55                                 II. ANALYSIS

¶ 56    Defendant argues that the State's use of the text-message conversation in rebuttal closing argument amounted to reversible error. Defendant also argues that the trial court abused its discretion in instructing the jury pursuant to any version of IPI Criminal No. 3.14. Defendant concedes that he forfeited these issues by failing to object at trial and include the issues in his

posttrial motion. See *People v. Cregan*, 2014 IL 113600, ¶ 15 ("To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion."). However, defendant invokes the plain-error doctrine, which allows us to consider an unpreserved error that is clear or obvious when (1) the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." See *People v. Belknap*, 2014 IL 117094, ¶ 48. Defendant argues that his claims are reviewable under first-prong plain error. There can be no plain error, however, unless we first determine that error occurred. See *People v. Eppinger*, 2013 IL 114121, ¶ 19. Moreover, a defendant may not raise a claim under the plain-error doctrine if he invited or acquiesced in the alleged error. *People v. Holloway*, 2019 IL App (2d) 170551, ¶¶ 44-45. As set forth below, plain-error review of defendant's claims is unwarranted.

¶ 57          A. State's Use of Text Messages in Rebuttal Closing Argument

¶ 58     Defendant's challenge to the State's use of the text-message conversation centers on the State's use in rebuttal closing argument of the first text message in J.V.'s and Sisti's text-message conversation. Specifically, the State recited the text message and argued:

> "4:39 p.m., the first text. Look out Jimmy is coming for you. If nothing happened, if this is all fabricated, why did Leo text that to [J.V.]. Why? Look out, Jimmy is coming for you. She heard footsteps, she made the assumption that it was Jim Buckingham coming down the hallway behind her. Why wouldn't she think that? Because Leo said, look out, Jimmy is coming for you."

¶ 59     Defendant notes that, while *J.V.'s* text messages to Sisti were admitted for multiple nonsubstantive purposes, *Sisti's* text messages to J.V. were admitted for the sole purpose of laying

a foundation for J.V.'s text messages. Contrary to this ruling, defendant contends, the State argued the substantive weight of Sisti's text message to "[l]ook out Jimmy is coming for you." Specifically, according to defendant, the State's argument "convey[ed] to the jury that it should find J.V.'s version of events to be more credible than the defendant's version because the message showed that Sisti interpreted the defendant's actions as an attack against J.V."

¶ 60    The State responds that defendant invited the State's argument by his accusations that J.V. was a "liar" and by defense counsel's use of the very same text message in his closing argument to argue that J.V.'s testimony was incredible and that she was "trying to game the system." The State also contends that it did not use Sisti's text message to prove the truth of the matter asserted, *i.e.*, that defendant sexually assaulted J.V. or that he was actually chasing J.V. Rather, the State contends, the text message was offered to explain J.V.'s fear and actions after the incident and "to rebut defendant's argument during closing that J.V. was lying and that somehow [Sisti] texting J.V. that defendant is 'coming for you' did not mean that defendant was actually 'coming for' J.V." Regardless, the State argues that defendant cannot establish plain error because the evidence was not closely balanced. We agree that defendant invited the challenged remarks; thus, we need not address the State's remaining arguments.

¶ 61    "It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant." *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). During closing argument, the prosecution may comment on the evidence presented, reasonable inferences from that evidence, the credibility of the witnesses, and may respond to comments made by the defense counsel that invite response. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. In reviewing the propriety of comments made during closing arguments, we must review the arguments in their entirety and view the challenged

remarks in context. *Id.* It is unsettled whether we review closing arguments under a *de novo* or abuse-of-discretion standard of review. *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 58 (comparing *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (*de novo*) with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (abuse of discretion)). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 86. The result is the same here regardless of the standard of review.

¶ 62    Where a defendant challenges remarks contained within the State's rebuttal closing argument, "they will not be held improper if they appear to have been provoked or invited by defense counsel's argument." *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). Moreover, the invited-response doctrine "allows a party who is provoked by his opponent's improper argument to right the scale by fighting fire with fire." *People v. Gorosteata*, 374 Ill. App. 3d 203, 221 (2007) (citing, *inter alia*, *United States v. Young*, 470 U.S. 1, 12-13 (1985) ("if the prosecution's remarks were 'invited' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction")), *overruled on other grounds by People v. Chambers*, 2016 IL 117911, ¶ 63; see also *People v. Nowicki*, 385 Ill. App. 3d 53, 90-91 (2008) (collecting cases).

¶ 63    The record demonstrates that this is precisely what happened in this case. During closing argument, defense counsel relayed for the first time the content of the very same text message that he now claims the State erroneously used in its rebuttal argument. Defense counsel told the jury in no uncertain terms that it would be presented with text messages and that the State would argue that J.V. and Sisti started a text-message conversation immediately or shortly after the incident. Defense counsel was explicit in in his reference to Sisti's initial message to J.V.: "Leo texted her,

look out Jimmy is coming for you." Defendant's position is that Sisti's messages had only been admitted for foundational purposes. Nevertheless, defense counsel proceeded to argue the meaning of the text message and how the jury should interpret it, essentially using Sisti's text message to argue that J.V. and Sisti had fabricated a sexual assault claim against defendant. Defense counsel's theorized that Sisti, as the building's "security guy" and also "in a relationship" with J.V., would not have merely sent a text message to "look out Jimmy is coming for you" had J.V. actually been sexually assaulted. According to defense counsel, "look out Jimmy is coming for you is the least of what a reasonable person in that situation would have done." Defense counsel concluded that Sisti "did not go after" J.V. "because there was no reason to believe *** that [defendant] was either going after her or that she had been assaulted ***." Defense counsel's argument invited the State's response.

¶ 64    In rebuttal argument, the State responded: "4:39 p.m., the first text. Look out Jimmy is coming for you, If nothing happened, if this is all fabricated, why did Leo text that to [J.V.]. Why?" The State proceeded to recount the text-message conversation and argued "[t]hat is quite a series to fabricate with your friend to support your claim of sexual assault to take down Jim Buckingham." The State's argument amounted to no more than an attempt to "right the scale" in response to defense counsel's explicit use of Sisti's text message to argue that J.V. and Sisti had fabricated a sexual assault claim against defendant. The State referenced the content of the text message to rebut defendant's arguments that J.V. was lying, that Sisti was not concerned for J.V.'s safety, and that J.V. and Sisti had concocted the claims against defendant. In this regard, we also note that the State's rebuttal argument was merely cumulative, as defense counsel already had recited the content of text message about which defendant now complains. See *People v. Glasper*, 234 Ill. 2d 173, 205 (2009) ("The prosecutor's argument was based on a reasonable inference

derived from the evidence presented, and did not expose the jury to any additional information that would have otherwise been excluded."). Accordingly, under these circumstances, defendant cannot now raise a claim for relief based upon a purported error that he invited into the proceedings. See *People v. French*, 2017 IL App (1st) 141815, ¶ 48 ("A defendant cannot claim error where the prosecutor's remarks are in reply to and invited by defense counsel's argument."); *People v. Enoch*, 189 Ill. App. 3d 535, 548 (1989) ("A defendant should not be allowed to benefit from his own counsel's conduct which invited the State's response.").

¶ 65    In sum, having determined that defendant invited the error about which he now complains, defendant may not avail himself of the plain-error doctrine. See *People v. Ruiz*, 132 Ill. 2d 1, 17 (1989) ("The prosecutor's comment was invited by defense counsel's own argument and thus was not error, much less plain error."); *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 79 ("[I]nvited errors are not subject to plain-error review."). Accordingly, we honor defendant's procedural default.

¶ 66                              B. IPI Criminal No. 3.14

¶ 67    Defendant's position on appeal is that the trial court abused its discretion in instructing the jury pursuant to "any version" of IPI Criminal No. 3.14. The State responds that plain-error review of defendant's claim is not warranted because defendant affirmatively acquiesced in giving "some form" of the instruction, as stated by defense counsel at the jury instruction conference. The State also argues that the instruction given was not an abuse of discretion and was harmless in any event. We agree that defendant affirmatively acquiesced in giving a version of IPI Criminal No. 3.14 and therefore need not address the State's remaining arguments.

¶ 68    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law

and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). Whether the trial court erred in refusing a jury instruction is reviewed for an abuse of discretion. *People v. Nere*, 2018 IL 122566, ¶ 29. Whether the jury instruction accurately conveyed the law applicable to the case is reviewed *de novo*. *Id.*

¶ 69     Section 115-7.3(b) of the Code allowed the State to introduce the evidence of uncharged sexual acts against J.V. for "its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2016). "Any matter" includes the defendant's propensity to commit sex offenses. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003). Thus, defendant argues, "[w]hen evidence of uncharged offenses is admitted in a case under Section 115-7.3, there is no risk that the jury will consider that evidence for an improper purpose because any purpose for which the jury considers the evidence is proper." In turn, defendant argues, "[w]hen there is no risk that the jury will consider evidence for an improper purpose, there is no reason to give the jury a limiting instruction concerning that evidence." See *People v. Perez*, 2012 IL App (2d) 100865, ¶¶ 58-59 (where evidence was admitted pursuant to section 115-7.3, the trial court's failure to give a limiting instruction at the time the evidence was introduced was not erroneous, and a limiting instruction at the close of evidence was "not required"). Accordingly, defendant argues, "[g]iving any version of IPI 3.14 in this case served no legitimate purpose."

¶ 70     This argument, however, is contrary to the position defendant took with the trial court. At the jury instruction conference, while maintaining his objection to inclusion of any reference to "propensity," defense counsel explicitly agreed to the use of "some form" of IPI Criminal No. 3.14 and proposed that the instruction read that "the evidence has been received on the issue of defendant's intent, motive and lack of mistake and may be considered by you for only that purpose." Moreover, not only did defendant fail to challenge the jury instruction in his posttrial

motion, defense counsel affirmatively represented at the hearing on the posttrial motion that he was *not* challenging the jury instructions. Defendant's affirmative acquiescence in the trial court's instruction of the jury pursuant to IPI Criminal No. 3.14 precludes review under the plain-error doctrine. See *People v. Dunlop*, 2013 IL App (4th) 110892, ¶ 12 (plain-error analysis applies to cases involving procedural default, not affirmative acquiescence). Accordingly, plain-error review of defendant's claim is not warranted.

¶ 71                                III. CONCLUSION

¶ 72    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 73    Affirmed.